TODD PROTECTOGRAPH CO. v. HEDMAN MFG. CO. et al.

(District Court, N. D. Illinois, E. D.   January 8, 1919.)

No. 733.

1. PATENTS ⬤➡66—ANTICIPATION—WHAT CONSTITUTES.
   Though an inventor might have put the suggestions of previous patents together, and possibly evolved his conception in that way, the previous patents are not anticipations, although such previous disclosures necessarily limit the subsequent patent.

2. PATENTS ⬤➡328—CONSTRUCTION—VALIDITY—INFRINGEMENT.
   The Todd patent, No. 793,249, for a printing apparatus for protecting checks from alteration, held valid, and claims 3, 4, and 5 infringed, while claims 1, 6, and 8 were not infringed.

3. TRADE-MARKS AND TRADE-NAMES ⬤➡68—UNFAIR COMPETITION.
   For trusted employés of a manufacturer to make preparations for a competing business while they were in his employ, and to obtain advertising matter from such manufacturer to use in the competing business, is unfair competition.

4. EQUITY ⬤➡65(1)—DOCTRINE OF CLEAN HANDS—AGENCY.
   The principal is not chargeable with the unjust conduct of its salesmen in pursuing its business, so as to preclude it, under the clean hands maxim, from equitable relief against an unfair competitor, where knowledge of the practices of the salesmen is not brought home to responsible officers of the corporate principal.

5. TRADE-MARKS AND TRADE-NAMES ⬤➡78, 97—UNFAIR COMPETITION—ADVERTISEMENT—INJURY—INJUNCTION.
   For defendants, who were competitors of plaintiff, to advertise its machines for sale under a fictitious name and address, is improper, and should be restrained; for, as customers could not find any such concern or street number, plaintiff would be discredited and injured.

6. TRADE-MARKS AND TRADE-NAMES ⬤➡73(1)—UNFAIR COMPETITION—ADVERTISEMENT.
   Where defendants, engaged in making a competing machine, sold plaintiff's patented machine, designed to protect checks from alteration, held, that defendants should make it clear in advertisements that plaintiff's machines were used or rebuilt ones.

7. TRADE-MARKS AND TRADE-NAMES ⬤➡68, 97—UNFAIR COMPETITION.
   Where trusted agents of plaintiff joined a competitor and laid plans to compete with plaintiff, held, that advertising matter obtained by such agents from plaintiff should not be used by defendants, and its use may be enjoined.

In Equity.   Suit by the Todd Protectograph Company against the Hedman Manufacturing Company and others.   Decree for complainant.

Edward Rector and Albert H. Meads, both of Chicago, Ill., and Frederick F. Church, of Rochester, N. Y., for plaintiff.

Lynn A. Williams and Robert M. See, both of Chicago, Ill., for defendants.

SANBORN, District Judge.   Suit for infringement of patent and unfair competition.   Plaintiff is a citizen of New York and defendants are citizens of Illinois, and the amount involved exceeds the jurisdictional limit.   The patent action rests on patent No. 793,249, issued

to L. M. Todd June 27, 1905, on a printing apparatus for protecting checks from alteration.

[1, 2] *The Patent.*—The Todd invention is described in Whitaker v. Todd, 232 Fed. 714, 146 C. C. A. 640 (Third Circuit), where the patent was sustained and held infringed. The following description is taken from plaintiff's brief:

"The inventive concept underlying Mr. Todd's invention, as clearly set forth in his patent, consisted in the thought that by first forming type characters of the full face and outline of the characters to be printed (whether they be figures or letters or other characters), and then impressing or forming, upon the printing surfaces or faces of such type characters, ridges and grooves (or equivalent projections and depressions) corresponding to the ridges and grooves of a co-operating universal platen, it would be possible to print upon a sheet of paper inserted between the type and platen the complete and perfect characters represented by the type (and not merely a crude and irregular outline thereof), and at the same time to so shred the paper that the ink absorbed by it would produce an indelible and ineradicable record.

"This was an absolutely new thing in the art, never before conceived or suggested, so far as the record shows, and involving not merely a novel and more efficient means for obtaining an old result, but in fact producing an absolutely new result.

"It was not only a new thing in the art of check-protecting devices, but it was an absolutely new thing in the printing art, for no such thing as either the combination of the type and platen of the Todd machine, or the sort of printing effected by that combination, was known to the printing art prior to Mr. Todd's invention, so far as the present record discloses.

"The nearest approximation was in certain prior check-protecting devices, such as those disclosed in the Beebe patents, Nos. 554,613 and 594,319. In such prior devices a series of projections or 'indenting points,' as they are termed in the patent (of various suggested forms), were so arranged upon a type block or support as to form the mere outline of a type figure, and arranged to co-operate with a platen having correspondingly arranged depressions or recesses to receive such projections. In order that the platen might be a 'universal' one, capable of co-operating with a number of different type characters formed in outline by such projections (such, for instance, as a cipher and the nine digits), it was necessary that such projections, and the corresponding depressions or recesses in the platen, should be arranged in certain definite geometrical relations to each other, which consequently determined the outlines of the type figures which could be formed by the projections, and limited them to the corresponding geometrical positions and relations.

"While it was possible, under such an arrangement, to form the crude outlines of a cipher and the nine digits, and have the projections forming such outlines co-operate with a universal platen, it was not possible to form even such simple type figures in either full face or perfect outline, so as to print upon the paper a full and perfect figure; and it was not possible at all to form letters and other characters—even the letters of the alphabet in plain English type—and cause them to co-operate with a universal platen in such manner as to produce a readable and intelligible impression.

"If we consider, as an illustration, so simple a legend as that printed by defendants' machine—for instance, 'Pay $999 and 99 cts.'—it would practically be impossible to print such a legend, in readable and intelligible fashion (and at the same time properly shred the paper) with any combination of type characters and platen known to the art prior to Mr. Todd's invention; and it would be wholly impossible to print it in the symmetrical and perfect fashion of defendants' machine with anything known to the prior art.

"And when we come to more complicated and difficult type characters, such as those involved in any extended use of the letters of the alphabet, even in English, and still more so in various other languages, it would be impossible to print them in legible fashion and shred the paper by means of any combination of type characters and universal platen known to the prior art.

"With a printing device embodying the inventive concept and underlying idea of Mr. Todd's invention, on the other hand, any and every conceivable sort of type figures and characters may be employed to co-operate with a universal platen in such manner as to print the full and perfect outlines of such type characters upon a sheet of paper, and at the same time so 'shred' the latter as to produce an indelible and ineradicable record. There is no limit to the use and application of the invention. If the characters to be printed are numerals, they may be in Arabic, or Roman, or any other form in which numerals are expressed. If they be letters and words, they may be in any known language, and if they be characters other than numerals or letters they may be of any conceivable form, without affecting the use and application of Mr. Todd's invention."

It would appear from the patent itself that this is the patentee's own idea. He says the object is to impress limiting markings on negotiable paper, so that the limiting amount is embossed and cut into its surface, the ink absorbed by the disrupted fibers, and an inked impression made on its face, so as to avoid fraudulent alterations.

In the Whitaker Case the principle of the Todd patent is differently described. The court say:

"The essential principle of this universal coaction is the maintenance of perfect alignment of the complementary ridges and grooves just before and at the instant of contact, and this principle is reduced to practice in the device of the patent by snugly fitting the revoluble type wheel and the platen against the side walls of the casing in a manner to obtain perfect alignment and prevent lateral motion at this critical point. This was the capital conception of the patentee."

In another case in the same circuit, also before Judge Dickinson at Philadelphia, against the New Era Manufacturing Company, a preliminary injunction was issued. In the New Era machine the ridges and grooves were diagonal, much the same as in Hedman.

The registry or mating of the ridges and grooves of the one part of the die with those of the other in the Todd patent is thus stated by Mr. Williamson:

"Todd in the patent in suit was the first one in the art to have devised a machine in which the projections on the one part would inevitably mate or register with the depressions on the other part, and in which the means for effecting the exact and circumstantial alignment of the moving part relative to the stationary part could be done away with or dispensed with; and he accomplished that result by a very simple, but very effective, means. What he did was to make the surface of the type member in the form of a continuous die. But he ran those ridges and grooves, not crosswise with respect to the direction of rotation or at some angle with respect to the directions of rotation, but ran those grooves in the very direction of rotation of the moving type-carrying member—circumferentially in the case of the drum machine; that is to say, the ridges and grooves ran around the drums continuously, with the result that, although he retained the advantages of mating or registration of die and counter die, he was enabled to dispense with the means of bringing an exact circumferential alignment of one member with respect to the other. Employing that circumferential grooving, ridging and grooving of his type-carrying member, ridges and grooves which would run continuously through all the several lines, he was obviously enabled to employ, as he did, a single or universal platen; that is to say, he did not have to have a separate platen or counter die member for each line of type, but one single counter die member with which any one of the several lines of type would properly mesh."

It was this feature which was made the gist of the Todd patent in the Philadelphia litigation, which certainly was novel. It was held infringed by the Whitaker device, although the direction of the ridges and grooves in that device was not quite parallel to the axis of rotation, so that when the drum and platen were not in action the diagonal ridges of the respective parts were out of alignment, and when in action the parts were made to register by a cam, by which the drum was moved sidewise. So it appears that the supposed true principle of the Todd invention, that of perfect alignment at all times, was not present in the Whitaker device; but the court decided that it was sufficient to produce infringement that the parts were properly aligned "just before the time of contact," and until contact was complete.

Now, inasmuch as every efficient machine of the kind must bring about complete meshing or mating, it follows that there can be no distinction in principle between a small deviation and a large one as between those of 1 minute or 85 or 90 degrees; the Todd principle of accurate registry "with the impressionable surface of the platen at every degree of rotation of the wheel, thereby avoiding the necessity of precisely centering the type characters opposite the platen in order to secure a proper register," is departed from as soon as the complementary lines are to any extent in different planes. The Circuit Court of Appeals of the Third Circuit having held that a 1-degree departure, which destroyed the alignment except at the very time of contact, and really departed from the Todd principle, was an infringement, Judge Dickinson was logically bound to decide in the next case (that of Todd v. New Era Co. [D. C.] 236 Fed. 768) that there was infringement in a 45-degree deviation, although the depressions are just as much horizontal or axial as longitudinal; and if in the case now under consideration the Philadelphia decisions are to be followed the Hedman machine infringes, because it cannot be distinguished from the New Era device, so far as the centering feature is concerned. Therefore, unless Hedman has different means or mode of operation, comity would suggest a decree for plaintiff, unless the device is distinguished in other respects.

It appears that plaintiff's counsel appreciate the situation, and realize that Todd cannot continue to dominate the trade for the three years the patent has to run by adherence to the principle of the Whitaker Case. They now take the position that, while they do not expressly abandon that principle, yet they do not predicate the case on the prior adjudications. They still rely on them, and think they should have great weight, but present the case on what they conceive to be its full merits. Their position now is that the true novel principle in the Todd conception was forming the type characters, impressing upon them ridges and grooves corresponding to those of a co-operating universal platen, inking them, and then, by bringing the surfaces together, to shred or macerate the paper.

It is true that one of the plaintiffs' counsel said on oral argument that he thought the construction of the court in the Whitaker Case placed upon the patent was entirely too narrow (in this I agree), and that plaintiff was not asking the court to be controlled by the rule

of comity. But the above nevertheless represents the ultimate position of both counsel for plaintiff. Counsel for defendants, on the other hand, take this position:

"For the purpose of this brief, and for the purpose of a decision by the court, at least, we accept the propriety of your honor's intention to follow the decision of the Court of Appeals of the Third Circuit. It has been our hope and expectation, however, that this court would follow the decision of the Third Circuit Court of Appeals. The reasoning of the decisions in the Whitaker Case, following as they did the arguments of counsel for plaintiff, leads inevitably to the conclusion that the Hedman Manufacturing Company does not infringe."

Then counsel proceed to argue that Hedman does not infringe the feature of parallelism, which was the only point of the Whitaker decision.

The respective devices may be generally described as follows: In the Todd "Protectograph," the first form built and sold under the patent, there was a revolvable drum or type support, on which were arranged 30 rows of serrated type, bearing the legends, "Not over twenty dollars," "Not over five hundred dollars," etc. When a check for $19 was to be drawn, the latter was inserted in the machine, the proper line of type turned into position, when a lever was operated to force the "twenty dollar" line against the platen to print the amount and shred the paper. There was, of course, a pad to keep the type properly inked by revolution of the drum. In the later model, called the "Check Writer," the operation is quite different. This is an "exact number" machine, having the following characters mounted on the drum longitudinally of its axis, in a narrow row, one above the other: "hund., ninety, eighty, seventy, sixty, fifty, forty, thirty, twenty, nineteen, eighteen, seventeen, sixteen, fifteen, fourteen, thirteen, twelve, eleven, ten, nine, eight, seven, six, five four, three, two, one, thous., dol'rs., cents," followed by a type "⌄⌄" to be struck before the first word and after the last to prevent additions to the amount written.

The drum is axially loosely mounted upon a rod twice its length, revolving on the rod to ink the type, and sliding lengthwise upon it to bring the proper type word into position for printing. The corrugated platen is located under the drum through its whole length. On the upper surface of the casing is a dial, representing all the word types on the drum, with an indicating point for locating the proper word and for sliding the drum back and forth on the central rod. If it is desired to fill up a check for "twenty dollars and twenty cents," the indicating point is pushed along to "twenty," a lever is worked to print the word on the paper and shred it, then the point is placed opposite "dollars," and that word printed, and so on for the rest of the legend.

Defendant's machine is quite different. In size it corresponds with the first form of Todd (the "Not Over" machine). It contains the Todd principle of first printing on the paper and then shredding, but does not contain the parallelism of ridges and grooves, being similar to the New Era machine held to infringe by Judge Dickinson. It uses only figures, so for a check of $20.20 it prints "Pay $20 and 20

254 F.—53

cents," all done by one impression of the type on the platen. There is a different mode of operation. Instead of the drum, with lines of words parallel to the axis, as in Todd's first machines, or separate words at right.angles to the axis, as in later models, Hedman has no cylinder at all, but slices up what would be the Todd drum into seven or more thin sectors, each having the zero and all the prime numbers 1 to 9, raised in proper order, and provided with ridges and grooves, on part of sector's edge, registering with a platen below, and each provided with a finger piece for rotating it. When the appropriate sectors are revolved into position to indicate the dollars and cents, the sectors or marking elements are lined up with the "Pay $," "and," and "cts.," and held in position by detents. A universal lever then serves to press the type against the paper and platen to print the legend and shred the paper.

The difference of operation will be readily perceived. In Todd the whole line of type in the "Not Over" machine, and the separate words in the other, are swung into printing position by movement of the whole drum, while in Hedman separate sectors of the drum are independently operated to bring the single figure carried by each one into printing position. The operation is thus described by Mr. Williamson, plaintiff's expert witness:

"In defendants' machine there are several side by side rotary devices, which for convenience I will term wheels, although they are but segments of a complete circle, which bear upon their peripheries a circular or circumferentially extending series of numerals, and there are two groups of these segments or wheels, one for designating dollars and the other for designating cents; and between the two groups of wheels there is a stationary logotype consisting of the letters 'a-n-d,' and to the right of the segments or wheels of the cents value there is a logotype consisting of the letters 'c-t-s,' and on the left of the dollars group of wheels there is a third logotype in the form of a sliding block, and it carries on its outer face the word 'Pay' and the dollar sign. So that, considering the two groups or segments, we have in effect a cylinder or drum which is divided into separate parts on planes at right angles with the axis of rotation, and aligning with any one axially extending row of numerals on the rotary segments when the latter are in printing position are the three logotypes, so that at the time of making the impression upon a check there is a line of type consisting of words and numerals extending parallel with the axis of rotation of the rotary type carrying member. On the type found on both the wheels or segments and the logotypes there are ridges and grooves."

The difference in the mode of operation is simply that one turns the whole solid cylinder into a certain position by one movement, while the other turns sectors of a like cylinder into a like position by several movements. The Todd single operation is merely divided up into several, with a similar result. It is like writing a name with a rubber stamp compared with writing it in the usual way. Three of the Todd claims in issue specify only a "type support," the form shown in the patent being only the preferred one, and there is nothing in the statement of the object of the invention which suggests a type drum.

The Beebe patents in evidence, including No. 554,613, do not contain the Todd principle of forming a word or letter on paper and then shredding the body of the paper, but use indenting points showing

merely the outline of the type characters, instead of forming their full face. The Parvin British patent of 1899, No. 3750, is a shredding machine, to be used upon paper on which the legend has first been written. But it is claimed that Parvin also disclosed the Todd conception. His device simply consists of a stamp, without cylinder or type characters, designed to shred paper previously written upon. In the specification, however, he says:

"The serrations can be made to any suitable design, so as to denote devices or words, or devices or words marked across serrations."

In his claim he counts on—

"preventing fraudulent alterations on checks or the like by crimping or stamping a series of serrations over the figures or letters whose alteration it is intended to render impossible without detection."

It is obvious that he had not thought out the problem, since his figures show only a stamp with only a single line of serrations, so that he could have had only a single line of words or figures. Evidently he never grasped Todd's idea. It is true that Todd might have put Hendrick's (No. 104,148), Beebe's and Parvin's suggestions together, and possibly evolved his conception; but that does not make them anticipations. By reason of these prior disclosures it is necessary to limit Todd more than it would be if they did not exist; but that is the full extent of their influence.

Coming, now, to the claims relied on, being 1, 3, 4, 5, 6, and 8, the elements of 3, 4, and 5 are substantially the same. They are (1) a type support provided with printing characters; (2) ridges and grooves on the printing faces; (3) an inking device; (4) a platen cooperating with the characters, with an impression surface registering with the ridges and grooves. Claims 1, 6, and 8 are narrower, and include a revolvable type wheel and circumferentially arranged grooves. The machine of defendants has all the elements of 3, 4, and 5, but instead of a type wheel has sectors of such a wheel, and the ridges and grooves are not circumferentially arranged. They are arranged diagonally to both the circumference and axis of the wheel or the sector. They might just as well be described as axially arranged as circumferentially. Claims 3, 4, and 5 are infringed, but not the others relied on. Defendants use what is thought to be the principle of the Todd invention, and any difference in operation is immaterial. Such difference is not a substantial or material one. The drum sectors used by defendants embody the Todd conception as fully as in the drum type of machine.

[3] *Unfair competition.*—The pleading and proofs relate to alleged breach of trust and violation of legal and moral obligation, disloyalty and treachery on the part of the defendants Fesler and Evans while in plaintiff's service, fraudulent sales of plaintiff's secondhand machines, impersonation of plaintiff's agents, advertising and selling such machines under a fictitious name, using plaintiff's advertising matter, alienation of loyalty of salesmen, and molestation of plaintiff's contracts of sale.

Another issue of unfair competition of plaintiff against defendants, mainly by misrepresentation of this suit by plaintiff's selling agents to the injury of defendants, was brought by counterclaim, and defendants sought a temporary injunction to restrain such misrepresentation. The suit was set for prompt trial, and the injunction accordingly denied. No claim is now made by defendants on this counterclaim, which should therefore be dismissed.

It appears that, after defendants' competition commenced by the sale of the Hedman machine, very strenuous sales methods were used by agents of defendants, and to some extent by agents of plaintiff, which, although reprehensible, were simply intense, as distinguished from unfair, competition. But there are other acts on the part of defendants for which they bear the whole responsibility, apart from anything done by their salesmen, which give an entirely different aspect to the case, although in some respects they may be bound by the acts of their agents, though specific knowledge of the particular acts is not proved.

Without attempting to detail the specific facts, the testimony shows that, while Fesler and Evans were important and trusted agents of plaintiff, they took up the Hedman machine (after first trying to sell it for a fair price to plaintiff), kept their connection with it a secret as long as possible, leased a building for manufacture and office purposes, and got as far along as possible to make and sell the device, meanwhile continuing in plaintiff's service. While owing the utmost fealty to plaintiff, and making more than the usual number of sales of the Todd machine, they used what time they could to make all preparations for their own plans, and alienating some of the Todd agents. They apparently thought they owed plaintiff no duty beyond keeping up the normal amount of sales, and that while they were thus serving two masters they were free to conceal the situation, and embezzle plaintiff's advertisements, some of which had been accumulating for a long time, were acquired at great expense, and were of the utmost value. This refers especially to the large collection of raised checks, which they photographed and later used in the Hedman business. This is probably damnum absque injuria, except that defendants may be restrained from using such advertising matter. In respect to disloyalty, and the use of advertising matter, see Merchants' Syndicate Catalog Co. v. Retailers' Factory Catalog Co. (D. C.) 206 Fed. 545.

The evidence also shows that defendants have sold Todd exchanged machines without distinctly stating to the purchasers that they were not new—have advertised sales of old machines without making the advertising matter clearly to show that they were not new machines. It further appears that they have sold such old machines to persons who they knew, or had good reason to believe, would sell them as new, and who would represent themselves as Todd agents. They used a fictitious business address and name in order to sell such old machines, which necessarily tended to discredit the Todd machine. It is also shown that they have in a few instances molested plaintiff's clients by inducing them to violate their purchase contracts for plain-

tiff's machines. They should be restrained from using advertising matter belonging to plaintiff, and from doing the other things referred to.

[4] The evidence shows that agents of the plaintiff in selling the Todd machine, and so far as they sold Hedman exchanged machines, have to some extent used similar reprehensible methods of competition; and it is claimed that the plaintiff, seeking equity in its favor, has not done equity towards the defendants, and therefore is not entitled to a decree against unfair competition, upon the equitable rule of "clean hands." This leads to an examination of the law in respect to how far the acts of sales agents bind their principals in a situation like this. Sales agents may charge their principal with liability for their unfair competition, although the latter is ignorant of their methods, because they are agents to sell, and their sales methods are as a matter of law those of the principal. Their agency, however, does not extend to direct injury of the principal, by charging it with unjust conduct in pursuing its business.

"The doctrine that he who comes into equity must come in with clean hands does not recognize mere imputations of guilt based upon technical theories of agency. To invoke it a knowledge must exist on the part of the principal of the facts upon which the charge of unconscionable conduct is based, and in the case of a corporation those facts must be brought home to the persons exercising general control over its affairs. * * * On the other hand, * * * the liability of the defendant for the acts of its agents exists entirely irrespective of knowledge of its officers" (citing Vulcan Detinning Co. v. American Can Co., 72 N. J. Eq. 387, 67 Atl. 339, 12 L. R. A. [N. S.] 102). Associated Press v. International News Agency (D. C.) 240 Fed. 983; Id., 245 Fed. 244, 157 C. C. A. 436; certiorari granted, International News Service v. Associated Press, 245 U. S. 644, 38 Sup. Ct. 10, 62 L. Ed. 528, affirmed December 23, 1918, opinion by Mr. Justice Pitney, Justice Brandeis dissenting.

The finding of the lower courts that plaintiff was not chargeable with unfair competition was accepted. The fact that both parties were accustomed to take news items from each other as tips to be investigated, and, if verified, the result of the investigation to be sold, the practice having been followed by news agencies generally, was held not to show an unconscientious or inequitable attitude toward defendant, so as to fix upon the plaintiff the taint of unclean hands. There is no evidence that plaintiff authorized or had knowledge of any acts of its agents which would deprive it of the right to an injunction against unfair methods of competition on the part of defendant's salesmen, nor is there very much evidence of such unfair methods. Unfair methods of plaintiff's agents might, indeed, be so general and persistent as to require the inference of knowledge by the principal, but the evidence fails on this point. And there is no evidence that plaintiff took an unconscientious or inequitable attitude toward defendant, but, so far as unfair conduct of its salesmen appears, it was rather by way of retaliation.

[5] In respect to defendants' advertising plaintiff's machines for sale under the name of "The Check Writer Emporium," which had no real existence, giving its address as "No. 655 North Franklin Street, Chicago," an entirely fictitious address, it seems clear that, as customers could not find any such concern or such street number,

plaintiff was bound to be discredited and injured, and that such advertisement should be restrained.

[6] It seems only fair to require defendants to make it clear in advertisements that the Todd machines offered for sale are used or rebuilt ones. Walter Baker & Co. v. Saunders, 80 Fed. 889, 26 C. C. A. 220, Ludlow Valve Co. v. Pittsburgh Co., 166 Fed. 26, 92 C. C. A. 60, Stix v. American Piano Co., 211 Fed. 271, 127 C. C. A. 639, Waterman Co. v. Modern Pen Co., 235 U. S. 88, 35 Sup. Ct. 91, 59 L. Ed. 142.

[7] Defendants have no right to the continued use of advertising matter obtained by it through the acts of Fesler or Evans while they were in a confidential relation to plaintiff, however free they might be to take or use uncopyrighted matter obtained since they were plaintiff's agents. Merchants' Syndicate Catalog Co. v. Retailers' Factory Catalog Co., supra.

There should be a decree dismissing defendants' contention, deciding the Todd patent valid, claims 3, 4, and 5 infringed, and claims 1, 6, and 8 not infringed, and for an accounting of damages and profits on account of the patent infringement, and that an injunction issue as above indicated, against further unfair competition, with costs.

I have assumed that damages or profits resulting from the unfair competition may be incapable of proof, but the matter may be deferred until the decree is settled.