AMERICAN INS. CO. v. LUCAS, Superintendent of Insurance Department of Missouri, et al.

Nos. 270–426, in Equity.

District Court, W. D. Missouri, Central Division.

Aug. 14, 1940.

898

For opinion denying motions for new trial, see *38 F.Supp. 926.*

William Marshall Bullitt, of Louisville, Ky., and David A. Murphy, of Kansas City, Mo. (E. R. Morrison and Homer H. Berger, both of Kansas City, Mo., on the brief), for Insurance Co.

Judge Charles L. Henson, of Jefferson City, Mo. (Charles J. Harvey, of St. Louis, Mo., and William G. Chorn, of Jefferson City, Mo., on the brief), for Ray B. Lucas and others.

Before STONE, Circuit Judge, and REEVES and OTIS, District Judges.

STONE, Circuit Judge.

This opinion is arranged in main and sub-headings, as to subject matter, as follows:

I. Statement.
II. Contentions.
III. Facts.
 (A) Outline of the Litigation.
 (B) Committees.
 (C) Groups.
 (D) Conduct and Control of Missouri Rate Litigation.
 (E) The Bribery and Collections of Money therefor.
 (1) Bribery negotiations.
 (2) Collections at New York for initial bribe payments.
 (3) Collections at Hartford for initial bribe payments.
 (4) Initial payments of bribe money.
 (5) Later payment of bribe money ($330,000.00).
 (6) Procurement of money for bribe payment of $330,000.00.
IV. Discussion and Determination.
V. Interest.
VI. Motions to Strike Answers.
VII. Costs and Expenses of Distribution.

### I. Statement.

May 28, 1930, one hundred and thirty-nine insurance companies filed 137 separate injunction suits against the Superintendent of Insurance and the Attorney General of Missouri to protect a proposed increase of premium rates for fire, windstorm and hail insurance filed by the companies with the Superintendent. After a hearing (on pleadings and affidavits) for temporary injunctions, such orders were entered upon conditions, one of which was that the company might collect the increased rate pendente lite but must deposit the amount of the increase so collected with a custodian of the court to await the ultimate outcome of the suits. Throughout several years during which the suits progressed toward final decrees, such deposits were made aggregating about $10,000,000.

May 18, 1935, before final determination of any of the suits, the then Superintendent (R. Emmett O'Malley) executed an agreement with C. R. Street ("agent" for the companies) whereby the Superintendent was to make an order allowing 80% of the increase and denying 20% thereof and declaring such order retroactive to the filing date of these suits; the impounded funds were to be distributed as provided therein; and the suits were to be dismissed. On May 21, 1935, the Superintendent made the rate order provided in the agreement. On June 22, 1935, the companies presented separate verified motions "for decree", stating that "the parties to this cause have by mutual agreement settled said cause and controversy involved therein, including the distribution of the funds impounded with the Court under its order and for a dismissal of this cause." Also, were filed separate stipulations "respecting distribution of the funds now impounded with the Custodian of this Court and to be impounded * * *." The motions prayed distribution of impounded funds in accordance with the stipulation "and that thereupon this suit shall be dismissed."

After proceedings involving interventions by a few policyholders (later withdrawn by them), separate decrees were entered on February 1, 1936, upon the above motions and stipulations. Each decree provided (1) that "this cause is hereby dismissed"; (2) that the impounded funds be distributed by the custodian to the persons and in the percentages set forth; (3) that jurisdiction be retained for purposes of costs, to effect the distribution, and "over all persons or parties affected by this decree * * * for all purposes of effectuating this decree." This distribution of impounded funds was to be 80% to the companies (of which 30% was to go to Robert J. Folonie and Charles R. Street, trustees) and 20% to the various policyholders from whom the premiums had been collected. Such payments to the companies and to the trustees were to be made "forthwith" and payments to policyholders were to be made as rapidly as possible.

Long after the above decrees had been entered and the above payments made to the companies and trustees and when practically all of the payments to policyholders had been completed,[1] the then and present Superintendent (Ray B. Lucas) filed (May 29, 1939) and presented a motion for cita-

tion against each of the companies. Such motion stated that the above agreement of settlement of May 18, 1935, had been procured by bribery of O'Malley by Street and that the decrees of this court upon the above motions and stipulations had been procured by fraud upon this court and that such orders "especially respecting the distribution of the fund, were the direct result of the fraud practiced upon this Court." The prayer was for citations:

"To show cause, if any they have, why said decrees of this Court made February 1, 1936, should not be set aside to the extent of the distribution thereof and that such decrees be so modified as to assure an ultimate distribution to policyholders of the entire fund unlawfully collected from them, giving credit for the sums paid them, and that they and each of them may be ordered and adjudged to pay to the custodian of this Court the full 80 per cent of all the said impounded fund, together with interest at at least 6 per cent per annum since the funds were taken from such policyholders.

"2. For such other and further relief as may seem meet."

Counsel for the companies participated in the presentation of this motion—expressing entire willingness to return to the custodian all funds distributed by him to them and to the trustees—declaring they wished no fruits from the decrees, but reserving their rights to litigate what action this court should take after such return of funds by them.

Upon the same day, this court entered two orders in each case. One order required restoration (by July 1, 1939) by the companies to the custodian of all funds distributed by him to the companies and to the trustees under the decrees. The other order required the companies (by June 15, 1939) to show cause "Why all the funds which have been ordered to be returned by it to the Custodian, Wm. T. Kemper, Jr., heretofore appointed in this cause under order of this Court on this date, as well as all other sums of money in the hands of said Custodian, should not be distributed to the proper policyholders and this cause dismissed at the cost of the plaintiff, including the cost of such distribution to such policyholders."

The companies complied with the orders of restitution. They answered the "show

---

[1] Various policyholders could not be located and there were disputes as to right to payment between persons in some instances.

cause" orders.[2] The Superintendent filed a motion to strike the answers. July 3, 1939, this court referred to a special master to take testimony and "to analyze and summarize" the testimony. This order provided: "That Mr. Paul Barnett be and he is hereby appointed Special Master to take testimony: (a) as to the conduct of the parties in this and companion cases, leading up to the action of the Court ordering distribution of the impounded fund deposited by the Insurance Companies with the Court's Custodian; (b) as to any connection therewith of any agent of the plaintiff authorized to act in connection with this litigation; and (c) as to the knowledge of

[2] Concisely stated, the identical answers of all, except six, of the companies set forth the following: The decrees of February 1, 1936, were entered in a court term long expired. Such decrees and motions therefor were predicated upon the existence of the rate order of May 21, 1935, made by O'Malley. That the controversies being represented to this court as having become moot because of such order by O'Malley, the court decreed the controversies to be settled and disposed of by the parties and no longer remaining for decision. That C. R. Street was "not in the general employment of the plaintiff but was the chairman of a committee which had existed for more than twenty years, which supervised matters of common interest to insurance companies, some two hundred in number, of which plaintiff was one."

That neither Street nor his committee was authorized to bribe O'Malley. That such bribery was without knowledge or consent of the company. That it paid money to Street upon his request believing such was to be used for lawful purposes. That such money was diverted by Street without its knowledge. That it renounced all advantage from the agreement with O'Malley and from the following decree. That such agreement and decree should not advantage either party. Tendered to the Superintendent an offer to vacate entirely the decree, to nullify the settlement and to restore fully all funds received thereunder. That opposing parties should make like restitution; the status quo prior to the agreement and decree should be restored; and the case determined upon its merits regardless of the agreement, of the rate order of May 21, 1935, and of the decree. Disadvantages to the company through the settlement, the rate order and the decree are set forth. Paragraphs 9 and 10 and the prayer of the answers are as follows:

"9. Plaintiff having placed the matter in statu quo as the same existed prior to the entry of the final judgment of February 1, 1936, it tenders to the defendants the privilege of entirely vacating the judgment of February 1, 1936, and striking from the files the verified motion of plaintiff for a decree and striking from the files the stipulation executed by counsel for the plaintiff and defendants, and offers to the said defendants the agreement that the said rate order of May 21, 1935, be declared null and void and of no effect and that restitution into the registry of the Court or hands of the Custodian be accomplished, and that if the defendants decline and refuse so to do and decline to nullify the said decree and the said settlement agreement and the said rate order, that then and in that case refusal of the defendants so to do should in equity be regarded as an affirmation by the defendants that they are not aggrieved by the said final judgment and the acts upon which the same rests and that the defendants are content to abide by the said final decree as entered, in which said event the said decree ought to remain in full force and effect and all sums adjudged to the respective parties in said decree be distributed and paid as in said decree provided.

"10. This Court may not in law and in equity distribute the sums in the possession of its Custodian otherwise than according to the terms of the final decree or alternatively if the defendants disclaim the said decree and the settlement agreement and rate order upon which the same are predicated, then the Court may make distribution of the sums in its possession only according to law to the lawful owners of said monies as may be determined upon an appropriate hearing and determination of the merits of the controversy, as set forth in the pleadings of the respective parties, and pursuant to the evidence and master's report and exceptions thereto. To make distribution in any other manner or summarily, as in the order to show cause proposed or asserted and as to which an order to show cause has been entered, deprives the plaintiff of its property without due process of law contrary to the first section of the 14th amendment of the Constitution of the United States. This Court is without power and ought not in law or equity dismiss this suit except only upon affirmation of the settlement if validity thereof be asserted by the defendants and they adhere thereto, or after a hearing upon the merits of the controversy and the determination of the Court if it should upon due hearing so

'any authoritative officer or officers of the plaintiff as to the acts of any such agent. But it is not to be inferred from this order that it has been determined by the Court that a finding as to each of the three matters of inquiry herein specified is necessarily deemed essential to the ruling of any question which has been or which may be presented for decision."

The purpose of the last just quoted sentence was expressly to hold open all questions of law until the court should have before it the entire fact situation.

The master has taken over 1,600 printed pages of testimony and filed such with his "analysis and summary" (in the form of a report). Briefs have been filed, oral argument heard and the issues submitted.

determine that the said bill ought to be dismissed for failure of the plaintiff to establish its case or otherwise according to the due process of the law, but that to dismiss the said cause at the cost of the plaintiff pursuant to the order to show cause is, and would be an unlawful and inequitable action, and such action if by the Court taken is violative of the due process of law to which the plaintiff is entitled by the provisions of the first section of the 14th amendment of the Constitution of the United States.

\* \* \* \* \*

"Wherefore, the plaintiff having fully answered the order of the Court to show cause prays that the said order may be discharged, and if the Court be so advised, that the Court make a rule upon the defendants within a reasonable time to state and assert in writing whether or not they consent to the vacating of the judgment of February 1, 1936, entered by this Court, and the finding by this Court of nullification of settlement agreement by mutual consent and nullification of rate order of May 21, 1935, by mutual consent, and restitution as may be ordered and directed by the Court into the registry of the Court or the Custodian of monies which ought justly to be placed back in the power of the Court, and that the defendants show cause, if any there be, why the Court should not proceed with the determination of the merits of the controversy between plaintiff and defendant as in their pleadings set forth in the event that defendants concur in the vacating of the various matters in question and that if alternatively the defendants adhere to and crave the benefits of such judgment of February 1, 1936, in whole or in part that they be declared by the Court to have ratified and approved the said judgment and decree of this Court and are content to abide thereby."

Of the six companies filing answers differing from the above, the answers of five differed only in stating that Street was a vice-president of the company but that he did not act as an official or employee of the company in his collections and handling of money in connection with the litigation but acted solely as chairman of a committee which had long supervised matters of common interest to some 200 insurance companies, including these five companies.

The remaining company (Western Fire Insurance Company) answered denying all knowledge of the bribery and renouncing any reliance upon the settlement or upon the decree. Paragraph 6 and the prayer of this answer are as follows:

"6. This court is without power and ought not in law or equity dismiss this suit except only upon affirmation of the settlement if validity thereof be asserted by the defendants and they adhere thereto, or after a hearing upon the merits of the controversy and the determination of the court if it should upon due hearing so determine that the said bill ought to be dismissed for failure of the plaintiff to establish its case or otherwise according to the due process of the law, but that to dismiss the said cause at the cost of the plaintiff pursuant to the order to show cause is and would be an unlawful and inequitable action, and such action if by the court taken is violative of the due process of law to which the plaintiff is entitled by the provisions of the first section of the 14th amendment of the Constitution of the United States.

\* \* \* \* \* \*

"Wherefore, the plaintiff, having fully answered the order of the court, prays that the defendants be granted a reasonable time within which to restore to plaintiff all benefits received by defendants under said decree and settlement and to cure any detriment suffered by plaintiff thereunder, and that upon such action by the defendants within such reasonable time as may be fixed then an order be entered vacating said decree of February 1, 1936, and disapproving the stipulation upon which said decree was based and that the court then proceed to hear and determine the merits of this case."

All of the answers pleaded that, if this court should order distribution to the policyholders of the restored funds, the expense thereof should not be chargeable to the companies.

## II. Contentions.

The Superintendent contends: (1) that corporations can act only through their agents and that they are bound by the acts of their agents committed within the scope of their authority and that C. R. Street was agent for all the plaintiffs in conducting this litigation and having bribed a public official and party to pending suits, the plaintiffs must be held to be bound by his acts and to suffer its consequences, among which is that the doors of equity must be shut upon their further claims for relief in suits so contaminated; and (2) that if the plaintiffs did not know that bribery was to be involved in this settlement, that they had such knowledge when the bribe was paid as to have been put upon inquiry.

The companies contend that the crux of the matter before this court is whether the separate companies had knowledge of the bribery transactions—meaning actual knowledge or facts sufficient to put upon inquiry. Absence of such knowledge is argued under four headings based upon conceived different fact situations as to various companies. The first heading covers 66 companies (mostly smaller companies) which made no contribution to the funds contributed to Street and used by him in the initial[2a] bribery payments. The second heading covers 13 companies which are in the same situation as the above 66 companies except that a vice-president of each of the three "groups" (making up the 13 companies) was a member of the Subscribers Actuarial Committee. The third heading covers 34 New York companies which contributed to the funds which Street used in the initial bribery payments. The fourth heading covers 26 Hartford companies which made like contributions.

Comparison of the just stated positions of the contending parties presents the issues: (I) whether actual or implied knowledge (in the sense of facts putting upon inquiry) is necessary; and (II), if such knowledge be necessary, the situation of the several companies in that respect.

## III. Facts.[3]

### (A) Outline of the Litigation.

The Superintendent of Insurance[4] in Missouri is an official having statutory powers and duties as to insurance companies doing business in Missouri. Included in such powers is the regulation of premium rates to be charged for insurance other than life (R.S.Mo.1919, Secs. 6283, 6286 and 6287—similar sections are R.S.Mo. 1929, Secs. 5873, 5876 and 5877, Mo.St. Ann. §§ 5873, 5876, 5877, pp. 4480, 4483, 4484). A statutory judicial review of any such rate orders of the Superintendent is provided (R.S.Mo.1919, Sec. 6284; R.S. Mo.1929, Sec. 5874, Mo.St.Ann. § 5874, p. 4482).

January 5, 1922, the Superintendent made an order reducing existing fire, windstorm and hail insurance rates by 15%.[5] Shortly

[2a] The bribery payments were made from two sources: (1) initial payments were made from a fund of $100,500 collected from certain major companies at New York and Hartford about May 2 and 3, 1935; (2) the subsequent payment of $330,000 from a fund, equalling 5% of the impounded premiums (less the initial contributions made at New York and Hartford) of about $350,000 collected from all of the companies in March and April, 1936. A third payment of $10,-000 was made, in October, 1935—the source of this last payment is not clear and it is not important in the proceedings now before the court.

[3] This statement of facts is an outline of only those matters deemed essential to an understanding and determination of the litigation. A more comprehensive summation of the testimony is contained in the excellent report of the master, which makes copious references to the testimony.

[4] From 1922 to this time, the successive Superintendents were Ben C. Hyde, Joseph B. Thompson, R. Emmett O'Malley, George A. S. Robertson and Ray B. Lucas.

[5] This order started a war of litigation, involving several subsequent rate orders by the Superintendent and many actions of various kinds in Federal and State courts. For determination of the immediate matters, it is not necessary to follow all of these contests in all their ramifications. Not all but much can be traced in the cases following: Ætna Insurance Co. v. Hyde, 275 U.S. 440, 48 S. Ct. 174, 72 L.Ed. 357; National Fire Ins. Co. v. Thompson, 281 U.S. 331, 50 S.Ct. 288, 74 L.Ed. 881; Ætna Insurance Co. v. Hyde, D.C., 34 F.2d 185; Id., 315 Mo. 113, 285 S.W. 65; Id., 327 Mo. 115, 34 S.W.2d 85; State of Missouri v. Thompson, 330 Mo. 1146, 52 S. W.2d 472; State of Missouri v. Sevier, 335 Mo. 269, 73 S.W.2d 361, certiorari denied 293 U.S. 585, 55 S.Ct. 99, 79 L. Ed. 680; State of Missouri v. American

thereafter, the companies affected joined in a State court injunction suit to prevent enforcement of this order. Soon after initiation of this suit, the parties entered into a stipulation[6] which provided for and resulted in withdrawal of the order and dismissal of the suit. Among other matters this stipulation prescribed: certain conditions applicable to contemplated future action of the Superintendent as to reduction of such rates; that the companies would challenge any such future order *only* by the statutory review method; that, if such character of challenge be made and the companies lose, each of them would make "refund to the assured of any excess of premiums [above the rates as reduced] collected by them."

Subsequent hearings before the Superintendent resulted (October 9, 1922) in an order reducing such rates by 10%. Shortly thereafter, the affected companies joined in a statutory review proceeding (in compliance with the stipulation). This proceeding resulted unfavorably for the companies. Ætna Insurance Co. v. Hyde, 315 Mo. 113, 285 S.W. 65. Certiorari was granted (273 U.S. 681, 47 S.Ct. 113, 71 L. Ed. 837) and, in 1929, the writ was dismissed on the ground that no federal question was presented because the aggregate experience of the companies in a joint suit furnished no basis to test the claimed confiscatory character of the order of the Superintendent as to each of the companies separately. 275 U.S. 440, 48 S.Ct. 174, 72 L.Ed. 357.

Shortly after this dismissal, 155 companies filed separate injunction suits in this court challenging validity of the 10% reduction order. On applications for temporary injunctions, the cases were heard together on the pleadings and affidavits. Temporary injunctions were granted as to 41 companies. They were denied as to 114 companies (without prejudice) on the ground that they came with "unclean hands" in that they had not made the restitutions to policyholders, as required by the above stipulation, since the statutory review proceeding had resulted unfavorably to them (D.C., 34 F.2d 185)—"without prejudice" meant that these companies might renew their applications for temporary injunctions upon showings they had made such restitutions.[7] Appeals by the 114 companies resulted in affirmances. National Fire Ins. Co. v. Thompson, 281 U.S. 331, 50 S.Ct. 288, 74 L.Ed. 881. In May, 1929 (soon after the affirmances), the 155 suits (including the 41 in which temporary injunctions had been granted) were voluntarily dismissed by the companies plaintiffs. These dismissals left the 10% reduction order in effect and thereafter unchallenged until December 30, 1929.

December 30, 1929, more than 200 companies notified the Superintendent of increases of 16⅔% of the then rates (the rate as reduced by the 10% reduction order)—this increase was a net increase of 5% over the rates as they had existed before any reduction orders were made. Pending investigations by the Superintendent, such increases were made effective as of June 1, 1930.

The Superintendent not having acted upon the notices (claiming he was in course of such investigation), 139 of the companies filed 137 separate suits in this court (on May 28, 1930) to enjoin him from interfering with collection of the proposed increased rates. On the same day, the Superintendent denied the increase.[8] July 2, 1930, this court entered orders for temporary injunctions against the Superintendent and the Attorney General conditioned upon separate bonds for $10,000 and upon payment to a custodian (appointed by the court) quarterly of the 16⅔% premium increase collected during each quarter year. In September, 1930, a special master was appointed to take testimony for final decrees.[9] February 19,

---

Colony Ins. Co., 336 Mo. 406, 80 S.W.2d 876; State of Missouri v. Sevier, 336 Mo. 442, 80 S.W.2d 893; American Constitution Fire Ins. Co. v. O'Malley, 342 Mo. 139, 113 S.W.2d 795; State of Missouri v. Sevier, 342 Mo. 346, 115 S.W.2d 810; Ætna Ins. Co. v. O'Malley, 342 Mo. 800, 118 S.W.2d 3; State of Missouri v. Sevier, 345 Mo. 274, 132 S. W.2d 961; American Constitution Fire Ins. Co. v. Robertson, 343 Mo. 198, 120 S.W.2d 43; State of Missouri v. Dinwiddie, 343 Mo. 592, 122 S.W.2d 912.

6 This stipulation is set forth in 34 F. 2d 185, at page 188.

7 The 41 companies were not parties to the stipulation.

8 On June 5, 1930, 56 other companies (later increased to 74 companies) filed a joint statutory State court proceeding to review the order of the Superintendent denying the increase.

9 This testimony, from over 300 witnesses, consisted of about 750,000 pages. Proceeding with all diligence, the master filed his separate reports in each case—

904

1934, the first five cases in which reports had been filed were submitted on briefs and oral arguments. April 29, 1935, orders were entered denying motions, in the five submitted cases, to strike from the answers of the Superintendent and Attorney General a challenge of "unclean hands" based on failure of each of these companies to refund to the policyholders the 10% of premiums collected (during certain periods prior to commencement of these suits) by each of them in violation of the above 10% reduction order of the Superintendent. Also this order required these five cases to be brought to issue upon such refund within ten days and, thereupon, re-referred to the master "for the sole and only purpose" of taking testimony as to refund payments made or attempted to be made "and/or reasons for not making such payments" by each of the five companies.

June 18, 1935, a verified "Motion for Decree"[9a] was filed in each of the entire number of pending cases. The day following, a "Stipulation" was similarly filed. June 22, 1935, these motions and stipulations were presented to the court. · At the same session of the court, there were presented applications for leave to file interventions by several policyholders who desired to oppose the motions. These applications were opposed. After subsequent proceedings concerning these applications, an order was made (November 13, 1935) permitting such interventions and also giving any and all other policyholders (whose premiums had contributed to the impounded funds) until December 31, 1935, to file interventions in opposition to the motions.[10] Thereafter, the proposed interveners withdrew their applications and no others were filed under the permissive order. February 1, 1936, decrees were entered, on the motions and stipulations, dismissing each suit and providing for distribution of the funds impounded with the custodian.

These impounded funds approximated $10,000,000. By 1939, this distribution was almost completed.[11] At this stage of the litigation arose the proceedings now before the court.

### (B) Committees.

While the insurance business is competitive, yet there are many matters of common interest—such as rates, regulations, adjustment of participating losses, and litigation concerning matters of common interest. To look after these common interest matters, various national, regional and local State bodies exist. Those with which we are more immediately concerned are the Missouri Inspection Bureau, the Subscribers Actuarial Committee and the Insurance Executives Association.

*Missouri Inspection Bureau.* This is Paul W. Terry doing business as the Missouri Inspection Bureau (unincorporated). The purpose of the bureau is maintaining fire insurance rates, filing with the Superintendent of schedules for various companies as an actuarial bureau under the Missouri Rating Act. It prepares and files general basis schedules, including basic charges, charges, credits, terms, conditions and riders, and permits for the doing of fire, windstorm and hail insurance business in the State of Missouri. For its compensation it makes assessments on the members of the bureau. It has a more or less set overhead expense for these ordinary routine duties. Every company is assessed on the basis of its premiums written in Missouri. This bureau makes a general assessment every year which includes excess expenses over the regular bureau expenses.

*Subscribers Actuarial Committee.* This Committee was formed, in 1915, originally to work out the details of the method of writing insurance for more than one year at rates reduced from the annual rates. It is not governed by any constitution, by-laws or rules. Because it represented all stock fire insurance companies' interests, it gradually was given other work to do for the companies. Among these added duties, were matters relating to term rates

---

the last report being filed in October, 1934. Each of these reports consisted of about 500 very large size double column printed pages—a total of some 68,-500 pages. The total aggregate of testimony and reports exceeding 800,000 pages.

[9a] These were the motions based on the settlement agreement of May 18, 1935, referred to above under "I. Statement."

[10] A memorandum opinion was filed by the court in connection with this order.

[11] All distribution to the companies and to the trustees. The distribution to the hundreds of thousands of policyholders had neared completion—most of the undistributed part being represented by checks returned from policyholders who had changed their addresses and by a relatively small amount where there were disputes, between policyholders and assignees or pledgees concerning the right to receive payment.

and fire insurance rates and supervision of the various State bureaus, with particular reference to their administrative and financial problems. There was a feeling among the companies that the entire operations in which the companies had a common interest could be more economically handled by the Committee. As the matter developed (the Committee being the only agency representing the common interests) all problems relating to the bureaus were referred to the Committee.

There were 7 or 8 members of the Committee and they are elected semi-annually, by the "subscribers", from executives (usually vice-presidents or managers) of the various companies. It has a chairman and secretary—"the secretary has kept a record, largely for his own guidance, as to what transpired at those [Committee] meetings, and what needed to be done, so far as the secretary was concerned, the secretary being the man who handled the detail of the work."

C. R. Street was chairman of the Committee during the period here involved.

*The Insurance Executives Association.* This Association is composed of chief executives of American companies and American managers of foreign companies—the main companies but not all companies in this litigation are members. It has a board of 15 trustees. It has only two officials, president and secretary (who acts as assistant manager under the president)— these officials are required to be non-stockholders in insurance companies. It functions as a convenient vehicle for looking after matters of common interest which are not local. It is a sort of working forum in which matters of general common interest to stock fire insurance business may be considered; and is a kind of clearing house for information in matters of that kind and of trouble. It aids in developing policies affecting the companies in common. It has no control of any kind over any insurance business but makes suggestions which are deemed helpful.

Paul L. Haid was president and J. D. Erskine was secretary during the period involved here.

### (C) Groups.

Most of these companies operated in "Groups," based on business affiliation, alliance, ownership or management. In a "group" there is either some mutuality of officers or a common management. A group usually is operated from a common office with a common staff of employees. Ordinarily, a group is known by the name of the oldest or the largest or the parent company therein. For convenience in this litigation, they are also designated by numbers—as "Group 1", "Group 2", etc. In some instances, only a single company is in a group. With the exceptions of Group 56 and Group 57, each group is composed of one or more companies. Group 56 is composed of six companies (foreign companies and their American subsidiaries) represented by the incorporated insurance agency of "Crum and Forster", which acts as American general manager for the companies in that group. Group 57 is the Underwriters Grain Association. This Association is not a party to any of these suits and represents solely an impounding account with the custodian of the court. This account is merely a matter of practical convenience based on the circumstances that the Association places large policies (only on grain in storage) participated in by different companies and that it would be difficult (for impounding purposes) to allocate single premiums among the companies participating in each of the different policies. There are 57 of these groups. A list of the members in each group is set forth in the report of the master at pages 18–23, both inclusive.

### (D) Conduct and Control of Missouri Rate Litigation.

Although Paul W. Terry (Missouri Inspection Bureau) filed the 16⅔% increase of rates schedules with the Superintendent and caused these suits to be filed by the separate companies to protect those proposed rates, the Subscribers Actuarial Committee was in complete charge for the plaintiff companies not only of these suits but also of the earlier and of the other litigations both in the Federal and in the State courts. It had sole direction of all of the Missouri rate litigations.

The Insurance Executives Association had nothing to do with any of this litigation. The only semblance of connection the Association had with this litigation was when Street requested Haid to assemble the New York executives at the time he collected the $62,500 (part of the $100,500 used for initial bribe payment) May 2, 1935, and when Street had Haid assemble "certain" executives for the meeting in March, 1936, to determine the 5%

906

contribution (used for the subsequent bribe payment of $330,000). These two meetings were not meetings of the Association nor of the trustees thereof. Street seems merely to have utilized Haid as a convenient person to get together those he wanted to see and to assemble and send to him (Street) the checks covering the above matters. Neither Haid nor Erskine had any connection with the Subscribers Actuarial Committee.

As said above, the Subscribers Actuarial Committee had complete control and direction of all of this Missouri rate litigation. The expenses of all kinds for this litigation as it progressed were collected for the Subscribers Actuarial Committee through the Missouri Inspection Bureau (Paul W. Terry) from the interested companies on the basis of Missouri premiums and expended under direction of the Actuarial Committee. No funds for such purposes were collected or expended in any other way, except those collected by Street for this bribery. Street had no connection at any time with the Missouri Inspection Bureau. While there was much and varied Missouri rate litigation, it was all handled as being one general controversy.

The Actuarial Committee hired, as general counsel to conduct this litigation, the law firm of Hicks and Folonie of Chicago. While Hicks was active in the earlier stages of the litigation, Folonie took charge later and was the active legal head beginning some time before commencement of the 16⅔% rate litigation and thereafter up to the filing by the Superintendent of the motion for citation in the proceeding now before the court. With consent of the Actuarial Committee, Folonie hired various local counsel at different times, who acted under his direction.

Although there were many discussions and some formal authorization by the Actuarial Committee, Street (Chairman of the Actuarial Committee) was the personage in whom centered the active and actual direction of the litigation. Much of this power, he seems to have assumed, but the Committee knew of and permitted it. No other member of the Committee was active in this litigation "other than the fact that periodically Mr. Street made a rather brief [verbal] summary of what was going on, based on the reports he had received from the attorneys from time to time." Not only members of the Committee knew that Street was directing the litigation, but also executives of many of the companies had such understanding. Street was the foremost fire insurance personality in the western territory. He was a man of long insurance experience, a dominating personality and one who did not tolerate opposition.

In all of the minutes of the Actuarial Committee, during 1935 and 1936, reference to the Missouri litigation is usually confined to reports from Street or from Folonie with no action by the Committee recorded. *One exception of importance* is that the Committee, on March 19, 1935, "approved" conferences which Street reported he had had concerning settlement of the litigation "and he was requested to proceed with those contemplated 'with power'." At this meeting (March 19, 1935), Street did not disclose nor was he asked with whom he was negotiating nor the terms being discussed (unless it was as to a 90–10% or a 80–20% compromise). Except this one time, Street never reported to the Committee concerning a settlement before the settlement was made and the motions for decree and the stipulations therefor had been presented to the court. The next entry in the minutes as to Missouri litigation is about two months (July 9, 1935) after the agreement and while disposition of the applications of certain policyholders to intervene (as hereinbefore set forth) were pending—such minutes show "reports received from Attorney Folonie from time to time on the progress of the settlement negotiations were presented in detail, and his [Folonie's] report of July 6th was read by the Chairman, following which the Chairman explained some of the ramifications of this controversy and asked for the continued support of the committee in handling this matter. After discussion it was voted the sense of the meeting that the Chairman be authorized to continue to conduct these negotiations along whatever lines seemed expedient." There was in minutes of this meeting, also, reference to certain advertisements concerning the settlement which had been published in Missouri newspapers. On the same page is "Memorandum of Proposed Settlement." Neither the report of July 6th nor the above "memorandum" could be found by the secretary of the Committee, who was the proper custodian thereof.

Except for the one or two members of the Actuarial Committee who (as company executives) attended the Hartford or New York meetings, the members of the Committee knew nothing of the collection

of the $100,500 bribe fund. Several of them knew of the 5% collection, but never investigated the purpose for it.

In June, 1935, the Actuarial Committee sent a circular letter to the companies stating that a settlement agreement had been made and giving the general terms thereof.[12] February 4, 1936 (three days after the decrees were entered) the Actuarial Committee sent a circular letter to each of the companies stating the decrees had been entered "disposing of this case. It [the decree] may be summarized as follows:" In this summary it is stated that "80 per cent [of the impounded funds] to companies, of which 50 per cent is to be sent to them directly, and 30 per cent to C. R. Street and R. J. Folonie, trustees." The last paragraph in the letter is as follows: "The money coming into the hands of C. R. Street and R. J. Folonie, trustees, will be employed to discharge any debts incurred by or under the direction of this committee; agreed amounts payable to the Superintendent of Insurance and for his counsel; court costs; Custodian's fees; attorneys' fees and expenses of counsel for the companies; costs of administering and safeguarding money in the hands of the trustees; contingent allowances or charges; any remaining balance subject to distribution to the companies will not, in the nature of the matter, be finally and completely distributable for some time to come."

The testimony is, and there seems to be no dispute as to the matter, that the Actuarial Committee authorized issuance of payment to the companies (in March, 1936) of the 11% from the 30% trustees' funds, although there seems no formal entry of such action in the very informal minutes of the Committee.

(E) The Bribery and Collections of Money Therefor.

(1) *Bribery negotiations.* The immediate actors in these sordid transactions were Thomas J. Pendergast, R. Emmett O'Malley, A. L. McCormack and C. R. Street. Pendergast was a political leader of pronounced influence in Missouri, engaged in various businesses and not an attorney. O'Malley was the then Superintendent of Insurance and a close friend of and adherent to Pendergast. McCor-

mack was engaged in and rather prominent in insurance business at St. Louis, Missouri; had been president of the State Agents Association in Missouri; and was a friend of O'Malley. C. R. Street (residing in Chicago) was vice-president of six companies[13] (of which he was western manager for five); was chairman of the Subscribers Actuarial Committee; and was in charge of the Missouri rate litigations for that Committee and, therethrough, for the companies.

"Early in 1935," O'Malley went to St. Louis and asked McCormack if he "thought that the insurance companies would want to settle the fire insurance rate case." McCormack said he had no authority whatever but, if O'Malley "had any suggestions to offer, I would be glad to convey it to Mr. Street." O'Malley replied that "maybe if Mr. Street would talk with Mr. Pendergast that they might be able to get together and dispose of the case." A few days later, McCormack went to Chicago and told Street what O'Malley had said. Street said he "would be glad to meet with Mr. Pendergast." McCormack returned to St. Louis and informed O'Malley, who said he would try to arrange a meeting time. Later, O'Malley telephoned McCormack that Pendergast would meet Street in Chicago on a certain date and McCormack telephoned that information to Street. This meeting was "two or three weeks" after the first trip of McCormack to Chicago. Street and Pendergast met—McCormack was in and out of the meeting which lasted an hour or an hour and a half. Street said "he would be willing to pay someone a fee for bringing an acceptable settlement." Street and Pendergast agreed Pendergast would be paid $500,000 for an "acceptable settlement." "Sometime later", McCormack was in Chicago and Street told him he "was willing to raise the amount to $750,000.00 to expedite the settlement." Within an hour, McCormack conveyed this information to Pendergast who was then in Chicago.

While exact dates as to the above negotiations do not appear, yet negotiations for a settlement had been going on before March 19, 1935—on which date the Subscribers Actuarial Committee authorized Street "to continue to conduct these negotia-

---

[12] June 12, 1935, the Missouri Inspection Bureau sent a circular letter to the company agents in Missouri enclosing a summary of the settlement agreement.

[13] The companies are known as the "Great American" group or Group 20.

tions" for a settlement and there is no evidence of any negotiations for any settlement other than these.

*(2) Collections at New York for Initial Bribe Payments.* In the latter part of April, 1935, Street wired Paul L. Haid (in New York City), who was president of the Insurance Executives Association, to arrange a meeting of certain named persons (executives of New York companies) at Haid's office for May 2nd, to discuss with Street a question of settlement of the Missouri litigation.[14] Besides Haid and Street, those attending the meeting were F. W. Koeckert (president or manager of 7 companies forming Group 11 and a member of the Subscribers Actuarial Committee), Bernard M. Culver and Ernest Sturm (president and chairman of the board, respectively, of 5 companies forming Group 12), William H. Koop (president of 5 companies forming Group 20), Wilfred Kurth (president of 4 companies forming Group 23), Robert P. Barbour (president or manager of 7 companies forming Group 34 and a member of the Subscribers Actuarial Committee), Harold Warner (president or manager of 6 companies forming Group 43) and Harold T. Cartlidge (deputy manager or "second officer", respectively, of the 6 companies represented by Warner). All of those present knew Street well.

The meeting was entirely informal, no minutes or notes were taken, and (according to varying estimates of those present) lasted 15, 20, 30, 45 minutes or "about an hour". The testimony as to what was said and done at this meeting is somewhat varied as to details; however, the outline appears to be as follows. Street did most of the talking and there was little discussion and no questions asked him. His statement was that he had been working upon a compromise and settlement of the Missouri litigation and "hoped" to accomplish it on the basis of return of 90% of

the impounded funds to the companies and some changes in premium rates; that he needed $100,000 immediately for "expenses", or "preliminary expenses" or "legal expenses"; that he expected to raise this amount from the companies in New York and in Hartford, which were those more largely interested, because it would be "physically" difficult to take up the matter with all of the companies involved in the litigation; that he would later render a full account; and that it was necessary for him to act as "agent" of the companies in such negotiations. He made no statement as to whom he was negotiating with; who was to get the money; or why it was needed (other than the general purpose above stated). He was not questioned as to any of these matters. He either suggested or said he would let those present know the amount each should subscribe and there were no questions nor objections to this.

Immediately after the meeting, Street gave Haid a slip of paper containing the names of certain companies and the amount to be subscribed by each. Street asked Haid to assemble the checks and send them to him. The same and the following day, Haid assembled and mailed the checks to Street without any letter or memorandum. Haid kept no record or memorandum of transmittal of the checks to Street or of receipt of them from the companies by Haid (except that he checked them off on the paper slip given him by Street until all were received and after mailing checks to Street, the slip was destroyed).

The total of these checks ($62,500) was made up of separate checks from companies represented at the meeting as follows: Group 11, Koeckert, $7,500; Group 12, Culver, $15,000; Group 20, Koop and Street, $10,000; Group 23, Kurth, $15,000; Group 43, Warner, $10,000; Group 56, $5,000.[15] These checks were (except one) payable to "C. R. Street, Chairman"—the

---

14 Haid testified the telegram could not be found and that it did not state the purpose for the meeting. Robert P. Barbour (United States manager for a group of foreign companies—Group 34), who attended the meeting, testified he was requested by telephone "to meet with some other gentlemen in order to discuss with Charles R. Street a question of settlement of Missouri litigation." Considering the remarkable blankness of Mr. Barbour's memory as to who attended the meeting and what took place there, we

take it that his retention of this fact is correct.

15 Group 34 represented by Barbour seems to have made no contribution. Another Group (56) made a check on the same date (May 2, 1935) to Street for $5,000. There is some testimony that J. L. Parsons, who represented Group 56 was at this meeting but he testifies positively that he was not and we accept his testimony—he obtained the information upon which he issued the check from Haid.

exception being Group 20 (in which Street was an executive officer) which was payable to "R. J. Folonie, Atty."

The book entries and memoranda made by the several companies issuing these checks—concerning the purpose for which issued—were as follows:

*As to Group 11.* The cash book entry was "N. L. Board, C. R. Street, Chairman, $7,500.00" ("N. L." means National Local Board). Ledger entry was in the account "Nat'l and Local Boards" and was "C. R. Street, Chairman—$7,500.00." Koeckert, who gave the information or instructions upon which these entries were made, testified that neither the National Board nor the Local Board had anything to do with Missouri litigation and could give no satisfactory reason for this wrong entry. Ordinarily, a requisition is made for a check. There was none for this check but only an office memorandum.

*As to Group 12.* There is considerable testimony concerning the manner in which this check item was handled.[16] A concise statement is that it was purposely handled in an "unusual" manner in a "suspense account" and as for "legal expenses".

*As to Group 20.* Requisition for this check was made by Street to be payable to "R. J. Folonie, att., in payment of advance on Missouri Attorneys' fees" and to be charged to "suspense". Neither Koop nor Street ever brought this matter to attention of the board of directors of the company issuing the check.

*As to Group 23.* Order for check made by Kurth to be "to order of Charles R. Street, Chairman" for "Advance on Missouri Refund Case, Legal". The journal entry was "Legal. Charles R. Street, Chairman Mo. Refund Case ...... $15,000.00." Although the progress or lack of progress of the Missouri litigation was mentioned by directors at their monthly meetings, Kurth never told them of this check or transaction.

*As to Group 43.* The order for the check was "to the order of C. R. Street Chairman" for "advance a/c Missouri Litigation". The memo for journal entry "Suspense Account Dr. $10,000.00 To Legal Expenses Cr. $10,000.00 Reason for transfer Payment made May 2, 1935 to C. R. Street, Chairman, as advance on account of Legal Expense, Missouri Litigation to be charged to suspense, as there is a possibility of its recovery."

*As to Group 56.* This check was issued on verbal directions of Parsons (president of Crum and Forster) to Wyatt (connected with Crum and Forster and vice president of the companies represented by that concern). The voucher, attached to the office copy of the check, showed "Ind. and Cos." (meaning "individual and company's account" in the ledger). There was nothing to show what the expenditure was for. The above voucher statement meant only an advance by Crum and Forster for the benefit of companies represented by them. There is no further record except a memorandum of apportionment of this amount between the seven companies represented by Crum and Forster. When this memo was made is not clear. It is entitled "Missouri Impounded Prem. as of 3/31/35"; next follows the separate, the total, and the percentage impoundings of the seven companies; next the $5,000 is apportioned to the several companies on the basis of percentages of impoundings shown.

*(3) Collections at Hartford for Initial Bribe Payments.* This meeting was at Hartford the afternoon of May 3rd, the day following the above New York meeting. A day or two before the meeting at Hartford, Street telephoned G. C. Long, Jr. (vice-president and in charge of western business of the major companies in the Phoenix Insurance group (Group 40)), asking him to arrange a meeting of executives "in authority" of the Hartford fire companies for the afternoon of May 3rd. Street said only that he had an important matter to bring before the executives. Long telephoned the executives.

The meeting was attended by W. R. McCain (Group 2), Alfred Stinson (Group 5), R. Clark (Group 8), R. M. Bissell (Group 22),[17] Gilbert Kingan (Group 28), Frank D. Layton (Group 31), Edward Milligan and G. C. Long, Jr. (Group 40), J. H. Vreeland (Group 45) and R. D. Safford (Group 53). Street opened the meeting and did most of the talking. He stated he believed he could settle the Missouri

---

[16] Sixteen printed pages of the master's report is devoted to a summary of this matter. The details appear mainly in the testimony of Culver, Emes, Moeckel and Henne.

[17] Also present was A. G. Dugan, general agent at Chicago for the major group 22 company, who happened to be in Hartford at the time on other business.

litigation and he was working on a compromise. "I can settle this case if the companies want me to, but I want you to trust me." He said he would need some money for "legal expenses" and "incidental expenses"; that he wanted to raise $100,000; that the New York companies had contributed about $65,000; and that he needed the balance. There was discussion concerning the advisability of settlement and the terms on which Street thought it could be made. Several of those present thought it was stated by Street that the money was needed to employ additional and local attorneys because the present attorneys were unfavorable to any compromise and, also, were not on good terms with State authorities and counsel for the Superintendent—others do not remember such statements. The only memorandum made of the meeting (see footnote 18) makes no mention of additional counsel to be employed either because present counsel not suitable for compromise negotiations or for any other reason. In fact, this memorandum, by inference, negatives such thought since it states the money to be raised is to be "turned over" to Hicks and Folonie (the then general counsel) "but it is not to be delivered unless the settlement, as above referred to, is effected". Street did not state with whom he had been negotiating nor whom he expected to pay this money to—no questions were asked concerning these matters. He expected the larger companies to advance these sums because it would be easier and more expeditious than trying to deal with all of the 137 companies. He made it clear that the $100,000 was needed immediately and he wanted to raise it right then and there. He stated there would be an accounting later. He wanted the companies represented to contribute the round figures he pro-rated to each.

There was no secretary at the meeting and no notes or memoranda were made by any one at the time. Later, Stinson made a memorandum for his own use. Because of illness, Stinson was not a witness. The contents of this memo are not remembered in all details by others at the meeting. It is as set forth in footnote.[18]

---

[18] "Memorandum

"Saturday, May 4, 1935 *In re*: Missouri Situation

"An effort is being made to settle the Missouri rate case thru the intervention of those who wish to terminate this long drawn-out legal struggle, and what is now proposed is that 80% of the impounded premiums shall be returned to the Companies, 10% shall go to the public and 10% will be for the expenses in the handling, and from and after a date to be fixed, maybe March 1st, the rate of premium applying in the State of Missouri will be as follows:

"The theoretical 16⅔ advance over the 90 brought the rate to 105%. We will, under this agreement, reduce this 105% theoretical rate to 100%, which is the rate that was in effect before the Hyde order.

"It is necessary to carrying on this activity, to use temporarily $100,000, which will be accounted for when the settlement is made and we are asked to contribute our proportion of this sum as shown below.

"A meeting was held yesterday in the Ætna Fire Board Room at which were present Mr. Ross McCain of the Ætna, Mr. Layton of the National, Mr. Milligan and Mr. Long of the Phoenix, Mr. Bissell of the Hartford, Mr. Stinson of the Automobile and Standard, Mr. Vreeland of the Scottish Union and National, Mr. Clark of the Caledonian, Mr. Safford of the Travelers, Mr. Kingan of the London & Lancashire and Mr. C. R. Street, Vice President of the Great American located at Chicago and Chairman of the Actuarial Committee.

"We were asked to contribute as an advance for legal expenses the sum of $37,500, as the participation of the group of companies centered at Hartford. $62,500 was raised among a few of the New York Companies on Thursday. Mr. Street is to turn this money over to our attorneys, Hicks & Folonie but it is not to be delivered unless the settlement, as above referred to, is effected. After the agreement has been effected the attorneys will appear before the court and secure its approval to a stipulation of this settlement, as above referred to and the advance money will be accounted for.

"The Hartford Companies are contributing as follows:

| | |
|---|---|
| Ætna | $ 5,000. |
| National | 5,000. |
| Phoenix | 5,500. |
| Hartford | 10,000. |
| Automobile & Standard | 3,500. |
| Scottish Union | 3,000. |
| Caledonian | 1,500. |
| Travelers | 2,000. |
| London & Lancashire | 2,000. |
| Total | $37,500. |

"Alfred Stinson
"HEM (Signed) Alfred Stinson."

Some one suggested that Long be given the checks and that he send them to Street at Chicago. The checks were: from Group 2, $5,000; Group 5, $3,500; Group 8, $2,000; Group 22, $10,000; Group 31, $5,000; Group 40, $6,500; Group 45, $4,000; and Group 53, $2,000—a total of $38,000. Six of these checks came to Long later that afternoon by messenger. The next day they were mailed to Street at Chicago with a letter.[19] The check of Group 2 was handed Street at the meeting. Layton, who represented Group 31, testifies he referred Street to the group western manager in Chicago, G. H. Bell. May 7, Bell gave the check for $5,000 to Street. This check was given on Street's statement to Bell that money was needed for attorney fees and expenses. Group 28 made no contribution. Its representative at the meeting (Kingan) told Street the matter was outside his jurisdiction and for Street to take it up with Carsten Claussen, his western manager, in Chicago. Street never mentioned the matter to Claussen. Some of the checks were payable to C. R. Street, Chairman, and others to Hicks and Folonie. Probably fifteen minutes of the meeting were devoted to the raising of the money—the balance to discussion of the suggested terms of settlement and to Street's statement.

The book entries and memoranda made by the several companies issuing these checks—concerning the purpose for which issued—were as follows. *As to Group 2,* it does not appear what, if any, book entries were made as to the check. *As to Group 5,* there was a check requisition stating check desired was for "advance Legal Fees" with instructions to charge to "General Expense". The expense journal entries show carried as "general expense". The entries in the "legal expense account" throw no light upon the nature of the transaction. *As to Group 8,* check transmitted to Long in letter marked *"Private"* and stating check "being advance payment in re Missouri litigation." The check had notation on face of "ad-vance Re Missouri litigation". The testimony seems silent as to what, if any, book entries were made. This transaction was not brought to attention of the board of directors. *As to Group 22,* carried in "suspense account" until end of year, and then probably (the evidence is not clear) charged to "legal expense". *As to Group 31,* there is no testimony as to how this was entered on the books. No memorandum concerning check or for what given was made by Bell, who issued it. The amount was shown in regular statement of "receipts and expenditures" made to the home office—no explanation of purpose of expenditure was given to or asked by home office. *As to Group 40,* the check bore on its face the notation "Advance in re Missouri litigation". How the expenditure was entered on the books does not appear. *As to Group 45,* it was entered on the books as "legal expenses". A receipt given by Street showed "In payment of (Handed to Atty. R. J. Folonie)." The amount was claimed as a federal income tax reduction item in 1935 and disallowed "for failure to substantiate the nature and reason for such expenditures." The only explanation given the tax examiner was "legal expenses in connection with the Missouri impounded premium." The disallowance was not protested. *As to Group 53,* the item was held in "suspense". Later, in March, 1936, it was charged to "legal exp." Five of the checks were payable to Street "Chairman", 2 to "Hicks and Folonie, Attys", and 1 to R. J. Folonie, Attorney".

No account was ever given by Street to anyone as to the use made of any of this money procured by him at New York and at Hartford and no such account was ever requested thereafter by any of those issuing the checks or by anyone representing the companies which gave the checks.

*(4) Initial Payments of Bribe Money.* After receipt of these checks, for $100,-500, Street took them to Folonie. Street endorsed the checks payable to him and requested Folonie to pass them and the checks payable to Folonie or to Hicks

---

[19] The body of the letter is as follows: "I enclose herewith cheques as follows:

| | |
|---|---|
| Scottish Union, | $ 4,000. |
| Caledonian, | 2,000. |
| Travelers, | 2,000. |
| Hartford, | 10,000. |
| Automobile, | 3,500. |
| Phoenix, | 6,500. |

all being in the nature of advances for litigation expenses in connection with the Missouri case.

"You will observe the cheques are made payable either to you as Chairman or to Folonie as Attorney. No acknowledgment is required."

and Folonie through the Hicks and Folonie bank account and to give Street two checks for $50,000 each. This was done. The two checks were cashed by Street and furnished the money for the first and second payments to Pendergast.

About May 9, 1935, two days after receipt of the last check (from Bell [for Group 31] by Street), Street telephoned McCormack (at St. Louis) to come to Chicago. McCormack was in Street's office next morning. Street gave him a package containing $50,000 in currency and asked him to take it to Pendergast. McCormack went to Kansas City by plane that day and delivered the money to Pendergast. Between this delivery and a meeting in Kansas City, on May 14, 1935, McCormack told O'Malley of the payment to Pendergast. At that meeting, the outline terms of a settlement were determined. This meeting was participated in by O'Malley, Street, McCormack, Folonie, local counsel for the companies, counsel for the Superintendent and an actuary from the office of the Superintendent. Counsel later worked this outline into the formal agreement of May 18, 1935.

About a week after this meeting, McCormack went to Chicago at Street's request. Street gave him a second package of $50,000 in currency for Pendergast. When this was delivered, Pendergast took $5,000 and gave McCormack $22,500 to deliver to O'Malley, which McCormack did, piecemeal at various times when requested by O'Malley.

*(5) Later Payment of Bribe Money ($330,000.)* About April 1, 1936, McCormack was called to Chicago by Street. Street gave him $330,000 to take to Pendergast, which McCormack did. Pendergast counted the money, kept $250,000 and sent $40,000 to O'Malley by McCormack. About six months later, McCormack was given by Street an additional $10,000 in currency which he delivered to Pendergast.

*(6) Procurement of Money for Bribe Payment of $330,000.* The money for this payment of $330,000 was procured by Street in the following way. Under the motions for decrees and the accompanying stipulations, 20% of the impounded funds were to go to policyholders and 80% to the respective companies. Of the 80% going to the companies, 50% was to go forthwith direct to the companies from the custodian.

The remaining 30% thereof was, under the motions for decrees and stipulations, to go to "Robert J. Folonie, one of the counsel for plaintiff, and Charles R. Street, Chairman for the insurance companies, who, for them, are supervising this litigation, which the said named parties will take as Trustees for and on behalf of plaintiff insurance companies, and to account therefor to the plaintiffs but not to this Court or the Superintendent." As entered, the decrees (February 1, 1936) provided, *concerning accounting* for this 30% going to the trustees, as follows: "they shall account only to the plaintiff; but if this Court shall so order, they are to file a report of disbursements with the Judges of this Court." February 7, 1936, Folonie and Street made a declaration of trust wherein they recited receipt [from the custodian] of United States securities of par value $2,500,000— the market value was then $2,770,562. The declaration provided that, out of such funds, would be paid (1) the sums required by the agreement with the Superintendent of May 18, 1935, a copy thereof being attached to the declaration (a total of $700,000); (2) costs, fees, and expenses assessed by any court; (3) "for other payments" directed by the Actuarial Committee in writing; and (4) distribute the remainder to the companies under directions of the Actuarial Committee.

In June, 1935, a circular letter had been sent to the companies by the Subscribers Actuarial Committee stating that an agreement for settlement had been made and giving the general terms thereof. February 4, 1936, the Subscribers Actuarial Committee sent to each of the plaintiffs a circular letter summarizing the provisions of the decrees of February 1, 1936. Among other things, the summary states that "30 per cent [of the impounded funds] to C. R. Street and R. J. Folonie, trustees." Also that: "The money coming into the hands of C. R. Street and R. J. Folonie, trustees, will be employed to discharge any debts incurred by or under the direction of this committee; agreed amounts payable to the Superintendent of Insurance and for his counsel; court costs; Custodian's fees; attorneys' fees and expenses of counsel for the companies; costs of administering and safeguarding money in the hands of the trustees; contingent allowances or charges; any remaining balance subject to distribution to the companies will not, in the nature of the matter, be finally and completely distributable for some time to come."

"Sometime" in March, 1936, Street telephoned or wired Haid to gather "certain executives" on a "named date" in New York. Haid telephoned the executives. Four attended—Sturm (Group 12), Koop (Group 20), Kurth (Group 23) and Warner (Group 43). The meeting lasted about fifteen minutes. Street told them he needed about $450,000 (including the $100,500 subscribed earlier) for "legal expenses"; that the additional $350,000 would approximate 5% of the formerly impounded funds; that the trustees were about to disburse 11% to the companies; that when they received checks for this 11%, he wanted them to send him checks for 5% to meet these legal expenses; that deductions from the 5% of amounts previously advanced (to make up the earlier $100,500) would be made. No inquiries nor further explanations were made as to what the money was to be used for; why the money was needed; nor why it was not paid direct by the trustees from their funds—"there was no discussion at all with reference to the necessity of getting the money right away." Procurement of consent to this plan was the only purpose of the meeting. There was no objection. The companies represented at the meeting had deposited with the custodian about 25% of the total impoundings.

The 11% checks were issued to each of the various companies and the 5% checks returned by them. The 11% checks were made payable to the several companies and all were signed "Robert J. Folonie and Charles R. Street, Trustees." All of these 5% checks (there were 91 checks) were made payable to "C. R. Street, Agent", except 8 made to "C. R. Street" and 7 made to "R. J. Folonie, Agent". All of the 5% checks are dated between March 18 to 29, 1936, except 11—10 of these 11 were dated in April and the remaining 1 (for $495.50) dated November 25, 1936 (the executive of that group having been away). The total was $347,582.64. From this, the $330,000 was sent to Pendergast.

At the time these 5% checks were issued the situation was as follows. All of the companies (including the agency of Crum and Forster (Group 56) and the Underwriters' Grain Association (Group 57)) had, with one or two exceptions, received all of the 50% of impounded funds going direct to the companies; all knew that they had theretofore, for several years, contributed (through the Missouri Inspection Bureau) to the expenses of the litigation as it progressed; all knew that, under the decrees, 30% (over $2,700,000) had been set aside to the trustees to take care of all expenses of the litigation; all knew that any balance over such expenses was to come back to the companies[19a]; all knew that the 11% checks had come from the trustees and represented such payments coming back to the companies; all issued these checks in conjunction with receipt of payment by the trustees of 11% from this trust expense fund; each knew that its 5% check was not made payable to the trustees or to either, as trustee—each check being made to one of the persons who was a trustee but to him as "agent" (except the 8 made to Street as an individual); all understood the checks had something to do with this litigation; most of them were informed or "assumed" the checks were for "legal expenses" or for "expenses" of the litigation; there could be no possible use for the checks except in connection with expenses of this litigation which was then closed except for distribution to the policyholders; theretofore, all expenses of this and related litigations during the entire time of the Missouri rate controversies had been paid to the Missouri Inspection Bureau on requisitions made by it—except the advancements made at the New York and Hartford meetings to collect the initial $100,500 bribe money.

Except in a few instances, the 5% checks were requested in person or by telephone by Haid, by Erskine (Haid's assistant) or by Street—the few exceptions were by brief letters. Except as shown hereinafter (in a few instances), there was no explanation given nor asked as to the use for the money except for "expenses" or "legal expenses" or the like. In those few instances where explanation or accounting was promised, none was ever offered thereafter and no further request ever made therefor.

The situation as to the information upon which these 5% checks were issued, any

---

[19a] The matters just recited above in this paragraph as to knowledge were known to all because (in addition to direct testimony of such knowledge by practically all of the companies) the Actuarial Committee had sent to each company the terms of the settlement in June, 1935, and also the terms of the decrees (embodying the distribution of the impounded funds, which was in line with the settlement) on February 4, 1936—both being before any of the 5% payments.

book entries, memoranda, correspondence, etc., is (stated in very concise form) as to each group, as follows:

Group.

1. Haid telephoned from New York to president of group companies at Newark, New Jersey, stating 11% check would be sent and 5% check desired to Street "in connection with Missouri impounded premiums". Requisition for check stated "In connection with Mo. Imp. Prem." Check issued solely on this statement from Haid. After check issued, president assumes he was informed by Haid that 5% check was for "legal expenses" because company books contain such entry. The parent company issued the check for the group and later the subsidiary company reimbursed for its proportion under check requisition issued for "5% legal fee—Missouri Impounded Prem."

2. No one in this group knows why this check was issued. Check does not show. No book entries in evidence. Check was for 5%, less $5,000 previously contributed to the $100,500 initial bribe money.

3. "Legal expenses" or "extraordinary expenses"— inquired as to details but got no information—told to send at once, did not inquire why.

4. Does not recall unless told for "some unadjusted expenses".

5. Memorandum of telephone request for check, from Haid, states it "is to supplement the amount [$3,500.00 contributed to $100,500.00 initial bribe money] that we sent * * * and this payment is for same purpose of advanced legal fees in connection with the rates in Missouri." Haid had said was for "additional legal expense needed in connection with the Missouri rate litigation." Check requisition shows "advance legal expense." Check has same notation. Expense journal (date of check issue) shows check amount but space to show on what account issued is blank. Later page of same journal, showing analysis of expenses for month, shows item as "Legal Expenses."

6. "Further attorney fees".

7. Did not ask what for and did not know—understood required by Street "immediately to met expenses"—presumed "legal expense" proper book entry for.

8. Letter from company accountant to Street states:

"We understand that an adjustment has been made in reference to expenses in connection with Missouri impounded premiums, and that some Companies have been refunded an amount on the advanced payment covering legal services.

"As we have not received a refund or advices regarding an adjustment, we would be pleased to have any information which you may be in a position to furnish us, as we are anxious to dispose of this item during the current year."

The answer from Street states:

"I intended to see you and explain this matter in person sooner but it has been impossible to do so.

&ast; &ast; &ast; &ast; &ast; &ast;

"There is also a second check for $1,090.12, which is 11% of your impounded Missouri premiums.

"Please now send me your check for $495.50, payable to my order, that being 5%, the same as has been collected from the other companies.

"Mr. Haid can give you any explanation you need if you will verbally confer with him, or I will do the same thing the first time I see you."

Check sent and no explanation asked or given thereafter. Letter transmitting check states "representing 5% of our proportion of advanced fees." Check has no notation. Receipt from Street stated "Legal expenses re Missouri Rate Case (5% Impounded Premiums)."

9. "Legal expenses in connection with Missouri impounded premiums".

10. "For purposes that the attorneys would decide". "Intended Mr. Street to take that and use it as he saw fit". The check bore "Re: Missouri impounded prems. Services and Legal Expense".

11. Confusion as to what was told in request for check. Told was for "some distribution Mr. Street was making * * * to the companies". Also told was for "same kind of expenses had in the first instance [contribution to $100,500 initial bribe fund which had been charged on this group's books as "N. and L. Boards"]. Check has no notation. Cash book stated no explanation originally but about a year later, on voluntary suggestion by Haid, "Legal Exp." was inserted. Ledger entitled "Legal Expense" showed "To cash C. R. Street, Agt. $8,281.67."

12. There was a memorandum (not produced) from Haid to official (now dead) of company. Check requisition states "additional legal expenses in connection with

Missouri Impounded Prem's," with notation "Charge Atty Fees No. 1". Letter transmitting check states no purpose. No notation on check. Letter from Street (September 25, 1936) stated that a firm of insurance accountants recommended that this item be stated in the "Conventional Form of Annual Statement" to State officials as "Legal Expenses in re Liquidation Missouri Impounded Premiums". No book entries in evidence.

13. "Attorney's fees and expenses in connection with this litigation".

14. Inquired and told he (Erskine) did not know what for. Then told Erskine he must know "what to charge it to. Is it to be charged against our recoveries, or is it a matter of legal expense in closing this matter up." Erskine said the latter. Check requisition stated "In connection with the adjustment of Missouri Imp. Refund to 4/30/36".

15. Not told purpose and didn't know but thought for "expenses"—book entry "advance expenses".

16. "For the payment of expenses and he [Street] incidentally mentioned attorneys' fees". Inquired purpose, for purpose of accounting. Cash book entry as to both 11% and 5%: "Missouri 16⅔ Imp. 11 per cent dividend account".

17. Attorneys' fees and expenses. Clark who authorized check was member of Actuarial Committee.

18. Legal expenses—testified check for 5% sent before knew of 11% check.

19. Legal expenses—check requisition is "in payment of Legal Expenses a/c Missouri Refund. Charge to Trustees a/c— Mo. Imp. Prem. Rehab".

20. Two checks issued—one by Detroit and Marine Insurance Co. and other for balance of group—Detroit check was issued on request of Street with no knowledge then or thereafter or purpose. The group check was issued on check requisition made by Street (who was a company executive official) stating "In payment of (Auditor from N. Y. Auth'zd. by Mr. Koop)" and "Charge to Mo. Impounded prems." Koop (a participant in New York meeting to raise the $100,500 initial bribe money) testified Street told him amount needed for "legal fees of the State court companies." Koop knew the settlement transactions were "confidential". No accounting given or requested thereafter as to either check.

21. "Legal expenses". Charged on "cash statement" to home office and on home office books as "cash paid" "legal expenses". No further explanation except monthly statement shows "legal expenses" and "Missouri Impounded Prem." No evidence as to who requested check.

22. Told check was "for the return of expenses on the compromise." It was "assumed" to be for additional expenses of the committee. No check requisition. Check shows no purpose. Handled in unusual manner—normally, expenses in western territory handled entirely by western department at Chicago, this was done at home office without knowledge of western department. No book entries in evidence.

23. Check issued on statement that it was "just a remittance on account, subject to proper accounting." No further statement as to purpose of check. No subsequent accounting given nor asked. Carried as "suspense" item (under "Special Account No. 3," which was a separate bank account and covered "entire Missouri impoundings") until end of year at which time necessary to show purpose in statements to authorities of various States. Then charged as "legal expenses". Check requisition shows blank in line thereon reading "In payment of"; also, payable to "C. R. Street, Agent" (the word "Trustee" had been crossed out and "Agent" added by drawer of check); also, "Charge to account Home Special a/c No. 3 (Comm's N. B. and F)". Check was "No. 1". On end of check face is "The Home Insurance Company Special Account No. 3."

24. Did not know what check was for. Thinks was charged to "Missouri impounded rate litigation case".

25. Disbursement voucher showed "For Missouri Rate Case" the item being designated "Gen'l. Fire". Cash disbursement accounts had entry "C. R. Street, Agt." and under heading therein of "Particulars" was entry "Missouri rate case, voucher 403, check No. 1218"; and, in same book, under "General accounts" it is entered as "Fire". Check showed for "Missouri Rate Case". Vice-president "presumed" was for legal expenses but no book or other entry to that effect in evidence.

26. Cash book shows entry "legal expenses". Column in cash book for entry of nature of item is blank—every other item on that page has entry in this col-

916

umn. Memo or voucher for check shows "legal expense".

27. Check showed "Legal Exp. re Mo. Impounded Prem." Reported to home office only "in accounts". No book entries in evidence.

28. Manager of western department of group told by Street that he had checks to companies for 11% "If he was given check for 5%". Manager thought strange way to handle and asked why not give him a check for the difference of 6%. Street said was "to simplify their bookkeeping and keep their records uniform". Asked what 5% was to be used for, Street said "that is something that he couldn't tell me just then". Further pressed as to purpose for check, Street said "I can't tell you that just now" and pulled out an envelope which he said contained checks from "all these managers in New York". Further asked if "is this money to be used in the settlement of this case, possibly to buy a judge or some one", Street answered positively no that the use was for "legitimate purposes only". On this conversation, checks issued. Cash book entry shows only "Missouri Insurance Department". No explanation for checks given home office. Checks contain no notation.

29. On back of check is "Legal Expenses Re Missouri Impoundment". Cash book shows "Legal Fee Acc't Mo. Imp. Prem", and under heading "Agency Balances" marked "Direct". In "Agency Record" appears "Missouri refund expense".

30. Vice-president was insistent on knowing purpose for check saying his understanding was that "the legal expenses were taken care of from the impounded premiums by court order"—his concern was how it should be stated in his company records. After receiving "confidential" letter from Street stating what had been paid from impounded funds, that all other companies but one had paid and that he would account, the check was given. Before giving check, this vice-president had letter from his Colorado State agent on which is hand written statement stating "The method of handling appears to be for the purpose of the committee to show payment of 11% to the companies how the 5% returned is to be recorded I haven't any idea"—this is signed "Reed". Witness has difficulty in explaining why these letters satisfied his doubt, although he wrote he was "satisfied".

31. Street said was needed, so western manager issued check. No requisition. No notation of purpose on check. Manager was member of Subscribers Actuarial Committee and "knew that Mr. Street had been given authority so to negotiate this settlement and to pay such expenses, etc., incidental to a compromise". Entered in books as advance for legal expenses in the Missouri litigation. Check was made out to Street "Trustee" but upon his statement that he was only one of the trustees and wanted it made to him as "agent", the word "trustee" was crossed out and "agent" added.

32. Check requisition states "5% of Missouri Impounded premiums as of 5/1/35" and directs account distribution to "Agents Balance" and "Charge to Agts Bal–Mo. Imp. Prem. a/c"—it is marked "Rush". Did not know what check was for but knew it was "chargeable to Missouri impounded premiums". Never asked nor got any explanation.

33. President made memorandum of telephone talk with Haid saying 11% would be sent and requesting 5% check. This memorandum is:

"To facilitate transaction Mr. C. R. Street, who as you know, has directed the rate litigation in Missouri, has asked us to transmit to you an additional payment amounting to 11% of the total amount of impounded premiums as of May 1st. We shall forward check at once for $10,234.79. As Mr. Street has immediately to meet expenses which require approximately 5% of the impounded premiums, may we promptly have your check for $4,652.18 made payable to C. R. Street, Agent, or if you prefer, to R. K. Folonie, Agent. Do not make your check payable either to Mr. Street or Mr. Folonie as Trustee. We presume you will want to charge this as legal expense."

Knew the 11% was out of trustees' fund. No book entry shown but stated was charged to "legal expenses".

34. Street said the check was "for the expenses in connection with the negotiations he was carrying for a settlement of the Missouri litigation". On this statement check issued. The space on check face for "in payment of" has "89" *over* it. There is a memorandum, having "89" in upper right corner, which shows "These checks represent 11% of the Impounded Prems, as of May 1st 1935" with addition of those two checks and calculation of 5%

thereof and notation "C. R. Street, Agent" —all this in handwriting of company official who authorized check. Book entries not shown.

35. Check issued with no knowledge as to what for. No accounting thereafter given nor requested.

36. Check issued on request from Haid for "legal expenses". Check requisition shows "Legal Expenses Mo." No further explanation of purpose of check.

37. Memorandum for check does not show purpose. Letter transmitting check states "covering 5% of the amount impounded by our group of Companies in the Missouri Rate Case, to May 1, 1935." No notation on check. Did not know nor inquire purpose of check. Cash book entry is "Missouri Imp. Adj. Acc't" (meaning Missouri Impoundings Adjustment Account). Ledger shows "Missouri Impounded Premium Adj. Acc't (Legal—other than claim)" with the item entry "C. R. Street agent a/c expenses".

38. Told needed for "legal expenses" or "general expenses" in connection with Missouri impounding affair. Memorandum given in connection with request for check states "charged to general legal expense in connection with the Missouri impounding." Check requisition states same.

39. Not told and did not ask what check was for. "Assumed" was for legal expenses. Witness "thinks" that books show entry as "legal expense, Missouri Federal rate case".

40. The "senior officer in charge" (during temporary absence of president and vice-president) was asked for the check and told that his absent officials would approve giving of the check. No purpose for check stated nor known when issued. On return of officials, brought to attention with no explanation nor questions from official. Official seems to have "regarded" as for an advance of additional attorneys' fees in the sum of 5% less their earlier contribution (part of $100,500 initial bribe money).

41. Told check "was to expedite the forwarding of the refund check to us representing the 11 per cent refund that we anticipated receiving, and we were told that this represented the expenses, which were referred to as legal expenses at the time" or, at least, "was to expedite the forwarding of the 11 per cent so called dividend check". The checks showed for "Imp.

Prem." and "Missouri Impounded Premiums". Memorandum showed "5% of impounded premiums".

42. Told check "was needed to pay litigation expenses in connection with the Missouri settlement". Neither the check requisition nor the check carried any statement as to the purpose of the check. Ledger entry showed "Legal expenses R. Mo. Rate litigation". In a one sentence letter of acknowledgment of receipt of check, Street stated "account Missouri litigation expense".

43. Company official attended New York meeting in March, 1936. He did not know amount desired, that is, what 5% of his group impounding was. Two or three days later, Haid sent him a handwritten memorandum stating "amount desired 22,-200.40 Previous payment [contribution to $100,500.00 initial bribe fund] 10,000.00 Balance $12,200.40 Check to *C. R. Street, Agent* to be sent here as soon as possible. P. L. H." [initials of Haid]. On this memorandum, check issued. Check requisition showed "Expenses re Missouri Rate Litigation", under "Charge to" was "Legal Expenses" which was lined through and "Suspense" substituted. Check face showed same notation. Originally charged on journal to "Legal Expenses" and subsequently transferred to "Suspense" by a later journal entry. Still later, in December before end of year, it was transferred back to legal expense. The "assumption" was that it was for legal fees though no one seemed to know definitely what it was for. Accounting promised but never thereafter asked for nor given.

44. Previous checks had been issued on request of Street stating "send me 30% and trust me". Later these checks were returned by Street in letter stating "The situation has changed since I spoke to you * * *." This letter requested check saying: "This simply increases the amount you will receive in the final distribution, a matter of bookkeeping, as it were, but it cannot be paid out of the Trustees' account—no bribery but legitimate expenses *which we cannot put in our report to the court* [italics added]. Full report will be made at the April meeting." Across this letter in handwriting was "Legal Expense —Missouri Impounded"—probably made by secretary of these companies. Checks stated "Legal Expenses Re: Missouri Refund". Earlier checks were made to the *trustees*, the later ones to C. R. Street,

*Agent*—this difference in payee was the only thing which aroused the curiosity of the company officials. The later checks were transmitted in a letter stating: "The procedure you suggest seems to be somewhat of an involved way of doing business, but we take it for granted that circumstances justify your request. Remittances are being sent you, therefore, although we admit, frankly that we do not know yet what it is all about." To which Street replied "Will tell you all about it at the Association [Western Underwriters Association] meeting at which I propose to make a detailed report. In the meantime can assure you it is all right." There is no direct evidence as to how these checks showed on the books of the company. No explanation was ever made or sought thereafter as to the purpose of the checks—any report at the Association meeting was "perfunctory".

45. Haid sent memorandum (with 11% check) showing amount of 11% and the 5% with request for checks for 5% payable to C. R. Street, agent. "Presumed" was for "legal expenses" and so charged on books. No showing on checks.

46. Two letters of same date from Street, one transmitting 11% checks and in the other, stating: "please send me your check to my order as *Agent* for 5% of the amount of your impounded premiums as of May 1st last. Will give you full details later." On this letter check was issued. It was charged to "Mo. Imp. Prem. Deposit" and check so stated. On suggestion in a later letter from Street (of November 9, 1936), this charge was changed to "legal expense". No "details" or explanation given or asked thereafter as to use of check money.

47. Told desired checks were for "legal and other expenses". On this statement checks issued with understanding Street would send "voucher". Check shows for "Missouri Rate Case". Letter of transmission states: "our proportion of the expense in connection with the Missouri rate case litigation". Street's acknowledging letter states "account Missouri litigation expense". Check register book shows charged "to expense on Missouri impounded premiums". Carried to ledger as expense. Was "a suspense item". No further explanation asked or given.

48. Told check needed for "legal expenses". Reverse of check shows: "Re: Missouri Impounded Expense".

49. Told check needed for "legal expenses". Face of check shows "Legal Expense". Cash book shows "Legal Expense" and item again appears under "Sundries". Journal shows "Legal Expenses". Journal Account (June 30, 1936) shows "Missouri Impounded Premiums Held by Trustees Expenses......$2891.02 Legal Expenses................. 2891.02

To transfer amount of $2,891.02 from Legal Expenses Account to Missouri Impounded Premiums, held by Trustee—Expense Accounts."

50. Told check needed for "expenses". Check requisition shows "Expense, Missouri Litigation," chargeable to "Suspense, Western Department". On back of check is "Expense, Missouri Litigation".

51. Did not know what check was for and never inquired. Check does not show. All they knew was it was something connected with Missouri litigation—"presumes" it was for "expenses other than through the trustees".

52. Those knowing about issuance of checks dead. Checks do not show purpose. Only information is that the man who knew about the transaction (now dead) instructed the auditor "to charge it to Missouri impounded premiums on the books".

53. This group had contributed $2,000 to the original $100,500 fund. February 26, 1936, the company official having charge of this western business sent a memorandum to the company auditor referring to the $2,000 check as "covering advance for legal services" and stating "I was recently informed that repayment of this advance would be made to us within a reasonable time, and suggest that you pend the file sixty days. It may take longer than that before the general expense in connection with the case involved is allocated, but you may be assured that when our proportion of the expense is billed to us that in some manner not yet decided upon we shall receive credit for the advance already made". On March 25, 1936, there was another memorandum which, after referring to the earlier memorandum, states "I have been advised that our charge for legal expenses up to May 1, 1937, amounts to $8,738.21. Having advanced $2,000.00 last year, there is a balance due of $6,738.21. Will you please let me have check today in that amount, payable to C. R. Street, agent?" On this memorandum the auditor endorsed "Chg. legal Exp. fire". There is a memorandum of a telephone message

of the day before (Mar. 24th) from Erskine stating ·check for 11% was being mailed and requesting check to C. R. Street agent for 5% of impounded premiums less the previous advance of $2,000.00. Erskine phoned (long distance) that he was sending 11% check and wanted a check for 5% made payable to C. R. Street, agent. Did not say what 5% check was for. Check contained no notation. Check transmitted to Erskine in letter stating "esmond [who had received telephone message] told me of your conversation late yesterday afternoon and in doing so acquainted me with details regarding the matter that I had had in charge, and immediately the office was open this morning, I got in touch with those necessary to the accomplishment of your desires." To this letter there was a postscript reading "Memo:—Check payable to C. R. Street, Agent for $6738.21 enclosed before mailing".

54. Check issued on letter from Street enclosing 11% check and requesting check "for $1,693.63, being 5% of your impoundments of $33,932.74—expenses". Also, the letter stated "Make your check to C. R. Street, Agent, and send to me under personal confidential, just as has been done by all others". Check does not show purpose. On above letter· was handwritten notation indicating check had been sent and stating "Chg. a/c 414 (Mo. Imp. Comm.)".

55. Told check for "expenses" and was "urgent". Character of expenses not stated but representative of group "assumed it was for legal fees". Check requisition stated "Legal Fees in connection with Mo. Imp. Prems." The place on check form "In payment of" is blank. Acknowledgment from Street shows "account Missouri litigation expense". Put on books as "legal expenses" or as "legal fees".

56. This group is an insurance agency (Crum and Forster) operating and managing certain companies (foreign companies and their American subsidiaries or affiliates) parties to this litigation. Told check was for "legal services, legal expenses" and check wanted at once. Company official regarded this as an advancement by the agency for the companies represented. Received memorandum from Haid showing "Check to C. R. Street, Agent, Amt. $11,419.41 Previous payment $5,000.00 [contribution to $100,500.00 initial bribe fund] Balance $6,419.41". On this memorandum, company official wrote "To be advanced by C. & F. [Crum and Forster]

until repaid by companies [represented by them]". Check shows no notation.

57. This group is the Underwriters' Grain Association. It writes policies only on grain in storage. These policies. are participated in by many companies. All of these companies are in this litigation. To avoid the inconvenience of breaking down the premiums of these policies among the participating companies for purposes of deposits with the custodian, the Association was allowed to make the impoundings on such premiums without breaking them down. It is not a party litigant. Told check needed for "Missouri litigation expenses". Asked for receipt for files and received such from Street showing "advance on the expenses in the Missouri Rate Litigation".

IV. Discussion and Determination.

Boiled down to ultimates, the above-stated facts show plaintiffs operating under a legal premium rate reducing premiums by 10%. The companies first challenged the validity of that rate by direct litigation up to the point where temporary injunctions were denied (without prejudice) to most of the companies, including all of the important companies. At that stage, the companies elected to dismiss all of the suits. Obviously, this step was prompted mainly by the desire and intention of the majority of the companies to avoid compliance with the stipulation made with the Superintendent to pay back the excess of 10% which they had collected during that litigation. If they had wished to test out the validity of the 10% reduction they could have done so in those suits merely by complying with their own stipulation by paying back this collected 10%. If, as testified by Folonie (the general counsel for the companies), "the objective of the litigation was to secure a declaration of the underlying methods of setting up a proper account with the State as to profit and loss and that their predicate was earned premiums as income, incurred loss and expense as outgo as the principal items * * [and] the money involved it was entirely secondary to establish that principle", this "principle" could even have been tested in the 41 suits in which temporary injunctions were allowed. Acting together, all of the companies plaintiffs in those suits saw fit voluntarily to dismiss all of those suits and, several months later, to make a left-handed attack upon the

10% reduction order through filing the 16⅔% increase rates and basing their litigation thereon.

At the time these later suits were filed, the 10% reduction order had been in unchallenged operation for several months. The 16⅔% increase rates were rejected by the Superintendent and never became the legal rates. Thereafter, when the present 16⅔% cases were brought, the only legal rates were those under the 10% reduction order.

■■■ In these 16⅔% increase suits, the plaintiffs sought temporary relief during the course of the litigation. Because of the practical situation that the companies could never recover the 16⅔% if this temporary relief was denied and they were finally successful, this court allowed them to collect the 16⅔% but only on condition that it be deposited with an official of the court. Such action never approached the establishment of the 16⅔% increase as a legal rate (United States v. Morgan, 307 U.S. 183, 195, 196, 59 S.Ct. 795, 83 L.Ed. 1211)—whether such rate was legal or not was the issue in and the purpose for the suits. The court enjoined the Superintendent and Attorney General from interfering with this temporary and interim collection of the excess over the 10% reduction rate. The court had no vestige of power to establish any rate—it could only protect the companies against a confiscatory rate. Central Kentucky Natural Gas Co. v. Railroad Commission, 290 U.S. 264, 271, 54 S.Ct. 154, 78 L.Ed. 307. In Missouri, the only power to regulate rates for insurance premiums rested in the Superintendent. He had denied this increased rate and was opposing any imposition of it by the companies.

■■■ The granting of this temporary relief—only during the litigation—by allowing the companies to collect the 16⅔% was never intended to and could not possibly have the effect of making the 16⅔% collections the property of either the companies or the policyholders. United States v. Morgan, 307 U.S. 183, 193, 194, 59 S.Ct. 795, 83 L.Ed. 1211. It was purely and solely a judicial method of procuring and of holding the 16⅔% in suspended control of the court to await the ultimate determination of whether such funds belonged to the companies or to the policyholders. Up to the time the decrees of February 1, 1936, were entered, the above was the status of the impounded funds. Up to that time, the merits of not one of these suits had been determined. Whether any company or its policyholders would get the impounded funds was as unsettled as when the suits were filed. This status continued until it was determined by the above decrees. If the cases had been dismissed for any purpose other than a decision on the merits, the impoundments must have gone back to the policyholders because they were the excess over the only legally established rates and nothing could disturb that status except a decision that such legal rates were invalid.

Those decrees were entered solely upon what appeared to this court to be an honest settlement of the litigation. Those decrees disposed of the impounded funds without any determination of the merits of the suits.

The compromise agreement, which never came before this court for action, provided for fixing of a rate by the Superintendent—to be retroactive to the beginning of these suits. The Superintendent fixed such rate before this court ever heard of any settlement. So far as this court was concerned, the companies could (under protection of the existing temporary injunctions) have continued to collect and impound the 16⅔% increase even after the agreement of settlement had been made on May 18, 1935.

The reasons why anything concerning this agreement was ever brought into this court were: that the suits were pending (with temporary orders); and that the official of the court held a large amount of impounded funds. It was those matters which were brought before the court. The court was informed of the order of the Superintendent and of the acquiescence therein of the companies. The plaintiffs moved to dismiss the suits (as they had the right to do at any time and for any reasons satisfactory to them) and the suits were dismissed. Only disposition of the impounded funds in the hands of the court remained to dispose of every feature of the litigation. That was in course of being done when the present proceeding arose.

The Superintendent asks the court to take from the companies the advantage of the impounded funds distributed to them because they secured such by decrees of this court based upon bribery and procured by fraud upon the court. The companies ask us either to leave the funds as distributed under those decrees or to require restora-

tion of the status quo at the time the suits were pending and, after such restoration of the status, to determine disposition of the funds by decisions upon the merits of the several suits.

This court will not stultify itself by leaving those decrees in full effect as to these funds, if the decrees were obtained by bribery and resultant fraud upon this court in procurement of those decrees: provided, the companies are legally responsible for such reprehensible actions. The court cannot restore the status quo—while the impossible return of the distribution already made to policyholders from the impoundments may be recognized and, conceivably, not insisted upon by the companies, yet there remains the rate order entered by the Superintendent. This court has no power to order rescission by the Superintendent of that order. But irrespective of the *power* of this court to restore such status quo, there is the contention of the Superintendent that these funds were wrongfully procured by the companies and should not be restored to them. A contention which must be determined.

The legal theory of the Superintendent is that a court of equity has power to do whatever is necessary to prevent itself being an unwitting instrument in the perpetration of an unconscionable fraud. In Bentley v. Tibbals, 2 Cir., 223 F. 247, 251, it is well stated that: "It is a venerable maxim of equity that one who comes into equity must come with clean hands. A court which seeks to enforce on the part of the defendant uprightness, fairness, and conscientiousness also insists that, if relief is to be granted, it must be to a plaintiff whose conduct is not inconsistent with the standards he asks to have applied to his adversary. In other words, the plaintiff's own conduct must not have been characterized by a want of good faith or a violation of the principles of equity and righteous dealing."

"The most direct application of the maxim is the uniform refusal of equity to assist one seeking its aid to enforce, or carry out to fruition, a transaction with respect to which plaintiff's hands are unclean." 21 C.J. p. 190, and cases in note 76. A court of equity is so jealous in guarding itself against such misuse that it will, sua sponte, apply the maxim whenever it discovers the unconscionable conduct. 21 C.J. p. 186, and cases in notes 44–46, inclusive. The maxim "touches to the quick

the dignity of a court of conscience." Wertheimer-Swartz Shoe Co. v. Wyble, 261 Mo. 675, 687, 170 S.W. 1128, 1130. The reason for the rule is not protection of the innocent party "but because it is against *public policy* to hear the case if the charge be established. The court acts for its own protection * * *." (Italics added.) Primeau v. Granfield, 2 Cir., 193 F. 911, 913, certiorari denied 225 U.S. 708, 32 S.Ct. 839, 56 L.Ed. 1267; and see McMullen v. Hoffman, 174 U.S. 639, 658, 19 S.Ct. 839, 43 L.Ed. 1117. "It is familiar doctrine that the extent to which a court of equity may grant or withhold its aid, and the manner of moulding its remedies, may be affected by the public interest involved." United States v. Morgan, 307 U.S. 183, 194, 59 S. Ct. 795, 801, 83 L.Ed. 1211.

While the cases, as to unclean hands, deal almost entirely with situations where the unconscionable conduct occurred before institution of the suit so that the plaintiff *came into* court with unclean hands, yet it would be strange if a court of equity had power—because of public policy for its own protection—to throw out a case because it *entered* with unclean hands and yet would have no power to act if the unconscionable conduct occurred while the case was in court. It would be as fantastic as to think that a householder could eject one who entered his house to steal the family silverware but could not eject a guest who entered innocently but whom he caught later stealing the silverware. Certainly there is no respectable legal authority for such an absurdity. "It is a power 'inherent in every court of justice so long as it retains control of the subject-matter and of the parties, to correct that which has been wrongfully done by virtue of its process' [cases cited]." United States v. Morgan, 307 U.S. 183, 197, 59 S.Ct. 795, 802, 83 L. Ed. 1211.

While equity jurisdiction is not a matter of "justice" or "natural justice" administered without fixed rules but is a system of jurisprudence with fixed precedents and principles, yet "The absence of precedents, or novelty in incident presents no obstacle to the exercise of the jurisdiction of a court of equity." 21 C.J. p. 35, and note 11. "The power to make precedents has not been exhausted * * *." State v. Anderson, 6 Tenn.Civ.App. 1, 9.

Here is an ancient maxim of equity founded on a long-established reason of public policy. That reason is as appli-

cable to hands becoming unclean during and in direct connection with pending litigation as it is to unclean hands initiating litigation. The reason being present, there is nothing which prevents application of the principle. The only difference is as to what the court can do at the time the situation becomes known. Obviously, it can do anything *then* possible to prevent the guilty party *realizing the fruits of his rascality.* We have no doubt of the *jurisdiction* of this court to act as the Superintendent contends. Whether it should so act depends upon whether the facts warrant such action.

This court protected the companies, at their instance, in the collection from policyholders of the $16\frac{2}{3}\%$ increase above the then legal premium rate. All of such collections, not already returned to policyholders, are in the custody of the court now. The situation is that they can be returned to the policyholders by the court. If the companies are legally responsible for the fraud upon the court in obtaining the decrees under which they were to receive these funds, the court is in a position to and should return such funds to the policyholders and to that extent prevent the companies from realizing upon the wrongful acts. The inquiry remains as to whether such action should be taken.

The facts that the settlement was procured by bribery and that a fraud was committed upon this court when it was induced to make that agreement effective, in part, by its decrees directing distribution of 80% of the impounded funds to the companies are clearly proven and not disputed. The real issue is as to the responsibility of the several companies for this agreement and these decrees so obtained as results of the agreement (provided for therein and intended to result from the agreement).

Since the companies concerned here are all corporations, they acted, necessarily, through agents. The person who participated in the bribery transactions resulting in the settlement on the side of the companies was Street.

■ The proof is clear that the Subscribers Actuarial Committee was in complete charge of this litigation for all of the companies without restrictions upon the

authority of the Committee as to what it did or how or by whom it acted. The evidence is clear that this Committee authorized Street to make a settlement, with knowledge that he was then in negotiations for a settlement—such negotiations resulting in this settlement. "If the mode or manner of executing the authority [of an agent] is not expressed, the principal is bound by the act of the agent if it be within the scope of his authority, although it be not done in the manner that the principal desired, or would himself have done it." 2 C.J.S., Agency § 121, p. 1345 and cases in note 40. Such is, also, the law in Missouri. Ruggles v. Washington County, 3 Mo. 496, (Reprint p. 264, 268). Here the authority of Street, as agent for each of the companies, was, therefore, complete, comprehensive and entirely undefined.

■■ As between *parties to a transaction* the knowledge of an agent, acting under a broad and unrestricted authority, such as Street had, regarding the transaction would be binding upon the principal. However, we are not concerned here with the rights of the parties themselves to this transaction. Our concern is the responsibility of the principals (companies) in connection with the application of the equitable maxim of unclean hands. The authorities are few as to the responsibility of a principal, as to unclean hands, for reprehensible conduct by the agent which, if done by the principal, would require application of the maxim. Those authorities [20] are unanimous in holding that knowledge in the principal of such acts by the agent is necessary and that such knowledge cannot be "imputed" to the principal merely because it is within the knowledge of the agent.

In all of these cases, knowledge of the principal was sought to be so "imputed" *solely* because the agent *alone* had the knowledge and because the agent had general authority to act in the kind of matters in course of which, the agent did the unconscionable things. In none of them was involved the situation where the principal possessed such knowledge as would put a prudent man on inquiry and where, if inquiry had been pursued, with proper dili-

---

[20] There are three cases, in chronological order as follows: Vulcan Detinning Co. v. American Can Co., 72 N.J.Eq. 387, 67 A. 339, 12 L.R.A.,N.S, 102; Associated Press v. International News Service, D.C.N.Y., 240 F. 983, 989; Id., 2 Cir., 245 F. 244, 247, 2 A.L.R. 317; 248 U.S. 215, 243; 39 S.Ct. 68, 63 L.Ed. 211, 2 A. L.R. 293 (title reversed); Todd Protectograph Co. v. Hedman Mfg. Co., D.C.Ill., 254 F. 829, 837; 7 Cir., 265 F. 273 (title reversed).

gence, he would have discovered the unconscionable acts perpetrated or contemplated by his agent. The only reference to such a situation is a dictum that "unfair methods of plaintiff's agents might, indeed, be so general and persistent as to require the inference of knowledge by the principal, but the evidence fails on this point." Todd Protectograph Co. v. Hedman Mfg. Co., D.C., 254 F. 829, at page 837.

There is no little looseness of expression, in the decisions, in the use of such terms as "actual notice", "constructive notice", "imputed notice" and "implied notice". The looseness of expression usually arises from the circumstance that the situation in the cases did not require careful differentiation, therefore, the resultant confusion as to use of these terms. All agree that "notice" is the equivalent, in law, of knowledge. Also, it is clear that there is a legal difference between two of the situations where one is legally held to know a thing concerning which he had no personal knowledge. One of these is where a person is held to know such fact although nothing occurred to awaken his attention thereto—such as that a deed had been recorded. The other is where a person is held to know such fact because something occurred within his personal knowledge which should have led him to make an investigation which would have disclosed the fact. The former is based upon some consideration of public policy which requires investigation, irrespective of the personal knowledge of the party—it is a rule of law independent of the factual situation as to personal knowledge. The latter rests entirely upon a fact situation as to personal knowledge—it is a rule of law entirely dependent upon a fact situation. As a matter of terminology, the word "imputed" seems to have been used as defining the former; and the word "implied" as naming the latter. A discussion of the above confusion in use of terms and of the use of "imputed" and "implied" as just stated appears in 46 C.J. pp. 539–541 with the numerous cases in the accompanying footnotes.

The three cases in footnote 20 of this opinion involved the situation where knowledge was sought to be "imputed" solely because of the relationship of principal and agent. There is nothing (except the above-quoted dictum) in any of them which has to do with a situation involving "implied" knowledge, where there was evidence of personal knowledge of facts in the principal to put him upon inquiry. Here, we are not concerned with "imputed" knowledge but with "implied" knowledge.

Wood v. Carpenter, 101 U.S. 135, 25 L. Ed. 807, was a case involving an application of a statute of limitations to a situation concerning the procurement of judgments by fraud and perjury. The plaintiff sought to avoid the statute because the fraudulent acts and the perjury had been concealed. The court quoted with approval (101 U.S. at page 141, 25 L.Ed. 807) the following: "'Whatever is notice enough to excite attention and put the party on his guard and call for inquiry, is notice of every thing to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it.' Kennedy v. Greene, 3 Myl. & K. 722. 'The presumption is that if the party affected by any fraudulent transaction or management might, with ordinary care and attention, have seasonably detected it, he seasonably had actual knowledge of it.' Angell, Lim., sect. 187 and note."

The Court of Appeals of this Circuit has said: "This doctrine [implied notice or knowledge] charges a person with notice of everything that he could have learned by inquiry where there is sufficient notice to put him on guard and excite attention" (Charles v. Roxana Petroleum Corporation, 8 Cir., 282 F. 983, 989); and "knowledge of facts and circumstances which would put a person of ordinary prudence and diligence on inquiry is, in the eyes of the law, equivalent to a knowledge of all the facts which a reasonably diligent inquiry would disclose." Weniger v. Success Min. Co., 8 Cir., 227 F. 548, 557.

The above quotations are declarations of a rule recognized and applied in all American jurisdictions (46 C.J. p. 543, and cases in note 10 which contains numerous citations from United States, and State (including Missouri) cases). The rule is generally applicable in equity as well as law. Equally it applies to agency—even to cases of ratification by a principal. 2 C.J.S., Agency § 42, p. 1085, and notes 22, 23 and 27; 2 C.J. p. 481, and cases in notes 37 and 38.

The rule is applicable to situations involving unclean hands. To hold otherwise, would mean that this beneficent maxim of equity could be defeated merely by the principal (for whose benefit an agent

924

grossly abused the powers of a court of equity) closing his eyes.

 What do the facts here show as to knowledge, actual or implied, as to each of these companies? There was implied knowledge as to every one of the companies. Each of them made contributions to the bribe monies through responsible company executives, under circumstances which would have put a reasonably prudent man on inquiry and, had such inquiry been diligently pursued, it is difficult to believe that any would have made such contributions or, if they did, that such could have been without knowledge that the money was to be used in surreptitious ways to bring about the settlement agreement—which all knew would require some sort of action by this court to make it effective.

The circumstances under which the 5% payments were made should have put any reasonably prudent man on inquiry as to the purposes for which that money was to be used. Those circumstances are as follows. Each knew that the Subscribers Actuarial Committee was in charge of the litigation; that the litigation had gone on for several years; that the legal and other expenses necessary to carry on the litigation as it progressed had been paid by regular assessments against it; that these assessments had been prorated on the basis of premium business; that they had been made and collected by the Missouri Inspection Bureau and by it alone; that legal counsel were employed and acting; that a full settlement of the litigation had been made; that the court had entered a decree disposing of the litigation; that such decree provided that 80% of the total impounded premiums were allotted to the companies, of which 50% of the impoundings were to come immediately and directly to the companies and that the remaining 30% of the total impounded premiums were set aside to trustees for the companies to pay all legal, court and other expenses of the litigation not already paid; that this 30% was a very large amount; that any balance of this 30% beyond such expenses was to be turned over pro rata by the trustees to the respective companies; that the 30% was more than sufficient for all expense purposes, because 11% of the total impoundings (over a third of the trust funds) was paid by the trustees from this fund in conjunction with the request for the 5%; that the 11% checks represented a balance from the trust fund not needed

for expenses; that, when any explanation was given as to the purpose for the 5% contribution, it was for something which the trustees should pay from the trust fund; that the 5% was not to go to the trustees but to one of them in another capacity. These entire proceedings were obviously very unusual. On the face, it was a payment (11%) from the unneeded balance in the trust expense fund and a contribution (5%) to other than the trustees, either for unrevealed purposes or for purposes covered by the trust terms. Yet these experienced company executives, with few exceptions, made these contributions without further inquiry although (the testimony shows) they required information before they would pay out money for insured losses or other company expenditures. The few exceptions were satisfied by promises of later accountings which were never made and which they never further requested.

In addition to the just stated situation—which applies to all of the companies—there were other considerations specially applicable to some (and the more important) companies. As to the six companies of which Street was vice-president, there was really actual knowledge. He was an executive officer of those companies, having to do with the litigation. It will not do to say that, because he was acting as their agent (through authorization of the Subscribers Actuarial Committee) his knowledge was not the knowledge of those companies.

As to the 51 companies represented at the New York and Hartford meetings in May, 1935 (when the $100,500 fund was contributed) and as to the 6 companies (Crum and Forster, Group 56) which were not represented at these meetings but contributed to this fund of $100,500, the situation was as follows: During the years of this litigation, all expenses thereof had been assessed by and paid to the Missouri Inspection Bureau and to it alone; this money was requested for the same character of expense (said to be "legal expenses") as theretofore passing through the Bureau; the "legal expenses" were in connection with a contemplated settlement; the amount desired was substantial; the reason given for requesting the contribution from only some of the companies was entirely unconvincing —any legitimate legal or other litigation expense could have passed through the Bureau just as all expenses of that character had done for years. The situation

was entirely unusual and indefinite. Men exercising reasonable prudence do not pay out money in this manner without inquiry as to what it is for. Apparently, in their ordinary expenditures, these men made such inquiries and required such knowledge. It is no answer nor excuse to say, as many did, that they trusted Street and that he resented interrogation. The same witnesses required such information from their own trusted employees in ordinary expenditure transaction; and the disposition of the one to whom an expenditure is made is no legal bar to inquiry nor excuse for not making such.

The conclusion is that these returned funds should be distributed to the policyholders in the measure that each contributed thereto.

## V. Interest.

█ The Superintendent contends that the companies should pay interest upon these returned funds. Where not controlled by statute or decision applicable to the situation before the court, interest will be allowed or denied "in response to considerations of fairness". Board of Commissioners v. United States, 308 U.S. 343, 352, 60 S. Ct. 285, 289, 84 L.Ed. 313. What do "considerations of fairness" require in the situation here presented?

█ This proceeding is not one of punishment. It is one of preventing the companies from enjoying any fruits from the decrees procured by fraud. They should return interest which they have received arising from the impounded funds each actually received. They should not pay interest upon funds going to the trustees which never passed to the companies but should pay any earnings upon such funds which earnings have passed to them from the trustees. If the interest on the particular money and securities so passing to each company can be followed, that amount should be the recovery. If such interest cannot be thus followed, it should be computed as at the average rate of earnings by the company on invested money during the period the company had the funds. The interest term should be from the date of receipt of the money or securities by the company to the date of the return thereof to the custodian. If any company and the Superintendent file in this court an agreement as to the amount of such interest due,

the court will accept such statement unless reason to do otherwise shall appear. In the absence of such agreement, determination of such interest will be referred to the master or otherwise determined as may seem best.

## VI. Motions to Strike Answers.

The court has preferred to examine and determine these proceedings upon the merits. Because of this attitude, the motions to strike the various answers to the show cause orders are, for the purpose of formally disposing of them, denied.

## VII. Costs and Expenses of Distribution.

█ The costs of these proceedings (including the compensation to be allowed the master for his services therein) will be assessed against the companies, because their acts alone have caused such costs.

█ As to the expense of distributing these funds to the policyholders, we think the companies are liable. However, there is a present practical situation which influences our determination of this matter. Rather early in this litigation, it was recognized by all parties and by the court that current funds would necessarily have to be provided for the compensation of the custodian and the regularly occurring expenses (of employees and otherwise) connected with the proper performance of his duties. By consent of all parties, this situation was met by setting aside, for such purposes, certain earnings made by the custodian.[21] Although a substantial amount remains in this fund, a distribution thereof to the something like 3,200,000 policyholders concerned would be a matter of a very few cents at most to any of them and would involve a burden of delay in distribution, caused by the necessity for allocation (the exact amounts differing as to almost every policyholder and having to be calculated for each), which would, in all probability, equal or even exceed in benefit to the policyholders anything derived by them through such distribution thereof to them. Influenced by what we conceive to be for the practical benefit to the policyholders, we think the distribution to them will be expedited by continuing to use that fund as heretofore. If it should arise that this fund is insufficient, then the companies must pay into this court the balance needed to meet

---

[21] The sources of these earnings were interest from the investment or deposit of the impounded, funds and profits from dealing with the purchased securities.

the compensation and expenses of the custodian until his discharge. Jurisdiction is expressly retained for such or related purposes.